JOHN C. SINNOT, SAMUEL WOLF, AND JAMES SANDS. PLAINTIFFS IN ERROR, *v.* GORHAM DAVENPORT AND OTHERS, COMMISSIONERS OF PILOTAGE OF THE BAY AND HARBOR OF MOBILE.

A law of the State of Alabama, passed in 1854, requiring the owners of steamboats navigating the waters of the State, before such boat shall leave the port of Mobile, to file a statement in writing, in the office of the probate judge of Mobile county—setting forth, first, the name of the vessel; second, the name of the owner or owners; third, his or their place or places of residence; fourth, the interest each has in the vessel—is in conflict with the act of Congress passed on the 17th of February, 1793, so far as the State law is brought to bear upon a vessel which had taken out a license, and was duly enrolled under the act of Congress for carrying on the coasting trade, and plied between New Orleans and the cities of Montgomery and Wetumpka, in Alabama.

The State law, in such a case, is therefore unconstitutional and void.

An act of Congress, passed in pursuance of a clear authority under the Constitution, is the supreme law of the land, and any law of a State in conflict with it is inoperative and void.

THIS case was brought up from the Supreme Court of the State of Alabama by a writ of error issued under the 25th section of the judiciary act.

The facts of the case are stated in the opinion of the court.

It was argued by *Mr. Phillips* for the plaintiffs in error, and submitted or a printed brief by *Mr. C. C. Clay, jun.,* for the appellees.

*Mr. Phillips* gave a history of the case, and then proceeded:

The construction given to this act by the Supreme Court of the State includes boats engaged in commerce between the ports of another State and a port within its own territory. See cases of Cuba, Swan, and Bell, 28 Ala. Rep., 185. And the question thus presented is, whether this is not an interference with the power to regulate commerce, within the meaning of the Constitution of the United States, and in conflict with the acts of Congress on the same subject matter.

Commencing with the act of 1st September, 1789, 1 Stat., 55, we find a provision for registering vessels, coupled with the declaration, that vessels so registered "shall be deemed and taken to be and denominated vessels of the United States, and entitled to the benefits granted by any law of the United States to ships or vessels of the descriptions aforesaid."

This registry is to be made with the collector of the district to which the vessel belongs, and the form of a certificate is given, to be signed by the Secretary of the Treasury, the party applying having first made the prescribed oath, which, among other, contains the names of the owners and their residences.

Bond is to be given that the certificate thus issued shall not be transferred, and provision is made that, in case of any change of ownership, it is to be given up to be cancelled, and a new certificate issued. The 22d section of the act makes similar provisions as to enrolment.

These provisions are re-enacted in the act of December 31, 1792, 1 Stat., 287; 18th February, 1793, 1 Stat., 305.

The statute of 2d March, 1797, makes provision for the case of a sale by process of law. 1 Stat., 498.

The 2d section of the act 2d March, 1819, authorizes vessels licensed to trade between the different districts of the United States, to carry on said trade "between the districts included within the aforesaid great districts, and between a State in one and an adjoining State in another great district, in manner and subject only to the regulations that are now by law required to be observed by such ships or vessels in trading from one district to another in the same State, or from a district in one State to a district in the next adjoining State."

By the act 29th July, 1850, 9 Stat., 440, it is provided that no bill of sale, mortgage, &c., shall be valid against any other person than the grantor or mortgagor, and those having actual notice, unless the same be recorded in the office of the collector of customs where the vessel is registered or enrolled. It is made the duty of the collector to keep a record of all such conveyances, and shall, when required, certify the same, setting forth the names of the owners, their proportionate shares, &c., for which fees are allowed.

The power to regulate commerce conferred in the Constitution of the United States includes the regulation of navigation, and was one of the primary objects which led to its adoption.

Gibbons *v.* Ogden, 9 Wheat., 567.

State of Pennsylvania *v.* Wheeling Bridge, 18 How., 431.

The power to regulate navigation is the power to prescribe rules in conformity with which navigation must be carried on. It extends to the persons who conduct it, as well as to the instruments used.

Cooley *v.* Portwardens Phil., 12 How., 316.

Is the power to regulate commerce thus granted to the Federal Government exclusive? In Gibbons *v.* Ogden the court say: "It has been concluded that, as the word 'regulate' implies in its nature full power over the thing to be regulated, it excludes necessarily the action of all others that would perform the same operation on the same thing. That regulation is designed for the entire result applying to those parts which remain as they were, as well as to those which are altered. It produces a uniform whole, which is as much disturbed and deranged by changing what the regulating power designs to leave untouched, as that on which it has operated. There is great force in the argument, and the court is not satisfied that it has been refuted."

In Miln *v.* State of New York, (11 Peters, 130,) which involved the constitutionality of an act requiring captains of vessels arriving in the port of that State to furnish a list of passengers, &c., and which was sustained as a police regulation, the court "waived the examination of the question

whether the power to regulate commerce be or be not exclusive of the States."

In commenting on this case, Justice WAYNE says that the power to be exercised under State authority was after the passengers had landed. That on the question as to the exclusiveness of the power the judges were divided, four being in favor of the exclusiveness, and three opposed, and to this state of opinion was owing the waiver above quoted.

7 Howard, 431.

In the passenger cases (7 Howard) Justice McLEAN said: "The power to regulate commerce, foreign and between the States, was vested exclusively in Congress." (P. 400.)

Justice WAYNE: This power "includes navigation upon the high seas, and in the bays, harbors, lakes, and navigable waters within the United States, and any law by a State in any way affecting the right of navigation, or subjecting the exercise of the right to a condition, is contrary to the grant." (P. 414.)

Justices CATRON and GRIER: "That Congress has regulated commerce and intercourse with foreign nations and between the several States, by willing that it shall be free, and it is therefore not left to the direction of each State in the Union either to refuse a right of passage to persons or property through her territory, or to exact a duty for permission to exercise it." (P. 464.)

In Cooley *v.* Portwardens of Philadelphia, the court say: "Although Congress has legislated on the subject of pilotage, its legislation manifests an intention, with a single exception, not to regulate this subject, but to leave its regulation to the several States. To these precise questions, which are all we are called on to decide, this opinion must be understood to be confined. It does not extend to the question, what other subjects under the commercial power are within the exclusive control of Congress, or may be regulated by the States in the absence of all Congressional legislation," &c.

12 Howard, 320.

But whether this power is exclusive or not, when Congress, in pursuance of the power, proceeds to regulate the subject

matter, it necessarily excludes State interference with the same subject matter.

In Houston *v.* Moore, (5 Wheat.,) the court say : . " We are altogether incapable of comprehending how two distinct wills can at the same time be exercised in relation to the same subject, to be effectual, and at the same time compatible with one another."

In Prigg *v.* Commonwealth of Pennsylvania, (16 Pet., 617,) the language of the court is: "If Congress have a constitutional power to regulate a particular subject, and they do regulate it in a particular manner, and in a certain form, it cannot be that the State Legislatures have a right to interfere, and, as it were, by way of complement to the legislation of Congress, to prescribe additional regulations, and what they may deem auxiliary provisions for the same purpose. In such a case, the legislation of Congress, in what it does prescribe, manifestly indicates that it does not intend that there shall be any further legislation to act upon the subject matter. Its silence as to what it does not do, is as expressive of what its intention is, as the direct provisions made by it."

The license granted to the steamer to carry on the coasting trade is a grant of authority to do whatever it purports to authorize. The States cannot add to the regulations made by the paramount authority, nor subtract anything from them.

Gibbons *v.* Ogden, p. 579.

The People *v.* Brooks, 4 Denio, 479.

The act of the State is in direct conflict with these principles, for, in effect, it declares that vessels engaged in foreign commerce, or the coasting trade, shall not navigate its waters, without complying with a condition not prescribed by the acts of Congress. If the State has the power to inflict a penalty for the violation of the condition, it is equally authorized to use force to prevent the violation.

It is not pretended that the act is based on the police power of the State; neither the preservation of the health, morals, nor the peace of the community, is affected by it. In the language of the Supreme Court of the State, its object is merely

to "advance the remedies for torts or contracts done or made by the agents of steamboats," &c.

While the power of the State over its legal remedies is admitted, this, like the taxing power of the State, cannot be exercised so as to interfere with the power delegated to Congress to regulate commerce.

Brown *v.* State of Maryland, 12 Wheat., 419.

Hays *v.* Steamship Company, 17 How., 599.

Towboat Company *v.* Steamboat Company, Law Register, March, 1857, p. 284.

The act of Congress of 29th July, 1850, provides the mode by which sales and transfers shall be made, and what shall be the evidence of ownership, while the act of the State disregards the mode thus provided, and declares a different rule shall prevail in its courts.

The case of the owners of the Swan against same defendant differs only in this—that the boat in question was engaged in the business of a lighter and tow between the wharves of the city and the vessels, and the vessels anchored in the lower part of the bay.

(See the succeeding case of Foster et al. *v.* Davenport et al.)

*Mr. Clay's* argument (adopting a brief filed by *Mr. J. T. Taylor*) was as follows:

There are three cases on appeal from the Supreme Court of Alabama, against this defendant, now pending. It is supposed they will all be submitted together, as the same question arises alike in all.

See the cases reported in 28 Alabama, 185.

The only question to be determined by this court is, whether the act of the Legislature of the State of Alabama is in violation of the Constitution of the United States.

The object sought, and the evil intended to be cured by the act, is clearly indicated on its face. The narrow and shallow channels in the bay and interior rivers of Alabama required the aid of legislative protection. Navigation would be impeded by the sinking of wrecks, discharging ballast, &c., by careless, negligent, and irresponsible seamen. On the narrow

*Sinnot et al. v. Davenport et al.*

rivers particularly, competition, strife, explosions, and collisions, were of frequent occurrence, against all which, the Legislature found it necessary to provide for the safety of navigation, and the protection of the life, property, and rights, of all persons trading or navigating the waters. But the whole of these police regulations were rendered inefficient, and irresponsible employés rendered more reckless, from the fact that responsibility could not be fixed on the *owner* and real wrong-doer. Even with the home vessels, in case of explosion, collision, or the boat becoming involved in debt, no responsible owner could be found; and if any name at all appeared, it was generally an irresponsible clerk or bar-keeper, or a man of straw. And as to those running from other States, the difficulty was greater; and where the vessel itself was lost, or exhausted by claims, no redress was or could be obtained for their injuries, depredations, and violation of law. To remedy this, the act referred to was passed, requiring simply the captain or managing officer of all *steamboats* running the waters to give the names of their owners, under such restrictions as would make the record *available*, in case of wrong, injury, or violation of law. It will be seen that the act does not in any way prohibit, obstruct, or interfere with *free* and uncontrolled navigation; and a compliance with it could not injure, but would encourage, both domestic and foreign trade and commerce. Neither is the law partial; it acts alike on *all*, and is for the benefit and protection of *all*.

The act, therefore, being for the purpose of carrying out and rendering effectual the undisputed *police regulations* of the State, is *itself* of the same *police* character, admitted, by undisputed authority, to be within the power of the States.

The coasting license authorizes the navigation of the waters, and the carrying on of trade and commerce within the States, but it does not pretend to authorize a disregard of the police laws passed by the States for the observance of its own citizens. And all laws for the protection of life, health, and property, inspection laws, and laws to prevent strife and confusion in bays, harbors, and rivers, and to secure the rights of

vessels navigating the waters, are of this kind. The following authorities sustain these propositions:

18 Alabama, 185.

11 Peters, 102.

4 Sandford, 492.

12 Howard, 299.

7 Iredel, 321.

16 B. Monroe, 699.

1 Parker C. R., 659, 583.

18 Mississippi, 283.

4 Rich., 286.

14 Texas, 153.

5 Texas, 426.

31 Maine, 360.

18 Connecticut, 500.

32 Maine, 383.

4 Georgia, 26.

12 Connecticut, 7.

7 Shep., 353.

2 Spears, 769.

2 Peters, 251.

14 Howard, 574.

The Legislature of New York passed "an act requiring the master of every vessel arriving at New York, from a foreign port, or any port of any other of the States, under certain penalties, to make a report in writing, containing the names, &c., of all passengers." The ship in question landed passengers, and failed and refused to file a *report*, as required. A suit was brought for the penalty. The defence was, that the law was unconstitutional; but it was held good by the Supreme Court of the United States, as a *police* law. The case at bar, and that above cited, differ in this only — one requires the names of *passengers* to be recorded, and the other requires the *owners'* names to be recorded. The law of New York was for the protection of her citizens only. The act of Alabama was for the mutual benefit of *all* persons and vessels.

2 Peters, 102.

2 Paine C. C., 429.

The State of Pennsylvania passed an act requiring all vessels to take a pilot, and on refusal shall pay to the master warden of the pilots, for the use of the society, &c., one-half the regular amount of pilotage. The Supreme Court of Pennsylvania and the Supreme Court of the United States held that this law was not void or inconsistent with the Constitution or any of the acts of Congress.

See 12 Howard, 299.

In this case, Justice DANIEL, in delivering the opinion, said: " The power delegated to Congress by the Constitution relates properly to the terms on which commercial engagements may be prosecuted, the character of the articles they may embrace, the permission and terms according to which they may be introduced, and do not necessarily, or even materially, extend to the means of precaution and safety adopted within the waters or limits of the States, by the authority of the latter, for the preservation of vessels and cargoes, and the lives of navigators or passengers; these last subjects are essentially local. In the case of Vezie *v.* Moore, 14 Howard, 574, this court says: " The design and object of the clause of the Constitution under consideration was to establish a perfect equality between the States, and to prevent unjust discriminations," &c.; and in accordance therewith have been the expositions of this court in the decisions quoted by counsel, &c.

And in nearly all the cases above referred to, it is held that a State has the right to make improvements in its navigable waters, in order to make the common right more beneficial to all, and to pass laws for mutual protection.

In Connecticut, it is held that an act of the State Legislature, imposing reasonable tolls as a compensation for improving the navigation, is constitutional and valid; that commerce is not crippled by such tolls, but the act of the Legislature comes in aid of the power of Congress.

18 Conn., 500.

In South Carolina, a law appointing a person to assign to vessels their proper places, and requiring a fee to be paid and a penalty for non-observance, &c., was held good by the Supreme Court of South Carolina.

4 Rich., 286.

It is also held by the Supreme Court of Texas, that an act of the Legislature, imposing wharfage dues on all vessels landing at Buffalou Bayou was constitutional, as these dues were limited to the improvement of the navigation of the bayou.

14 Texas, 157.

A case was lately decided in New York, where most of the authorities on this subject are collected. The case was this. The Legislature passed an act as follows: ·

" Whenever any steamboat shall be navigating in the night time, the master of such boat shall cause her to carry and show two good and sufficient lights—one to be exposed near her bow, and the other near her stern, and the last shall be at least twenty feet above her deck."

The defence was, that the steamer in that case was not bound to carry more than one light, because she was a vessel owned in another State, navigating a river subject to the jurisdiction of Congress, under a national enrolment and license. In this case, too, Congress had acted on this same subject matter. The act of Congress of 1838 made it the duty of masters and owners of every steamboat, running between sunset and sunrise, to carry one or more signal lights, under a penalty, &c., and it was further contended that the license prohibited a further requirement to be added by the State; but the court, after a full argument, held the State law good, and that the defendants were liable for all the penalties imposed for disregarding it. See the case and the numerous authorities there cited.

4 Sandford, 462.

II. If it should be considered that the act of Alabama is not a police regulation, still, as it is necessary for the protection and the security of the rights of all persons trading and navigating the rivers, and is not in direct conflict with any act of Congress, it will be held good. It was never intended by Congress, in passing general laws for all the waters of the Union, to prohibit the States from passing such other regulations, not in conflict, that might be found necessary for safe

and peaceful navigation, on particular streams or localities. In 14 Howard, United States, 296, it is said that "the grant of commercial power to Congress does not forbid the States from passing laws, not in conflict with the acts of Congress. The power to regulate commerce includes various subjects, upon some of which there should be uniform rule, and upon others different rules in different localities."

In the case 4 Sandford, the court, after commenting on the authorities of the Supreme Court of the United States, says: "If any principle may be deduced from the decisions and opinions of the judges of that high tribunal, it is this: that each State may pass such laws affecting commerce, to operate within its own limits, not in conflict with the provision of the Constitution of the United States, or acts of Congress, as are necessary for the preservation of the life, the health, the personal rights, and property of its citizens, and of those enjoying its protection." A great majority of the cases already cited hold the same. The object of the act of Alabama was to afford all passengers and persons trading, or navigating the waters, some certain evidence by which to sustain their rights or redress their wrongs, and a means of getting at the secret wrong-doers; to give fair play and ready redress to all. Upon examining this act with the acts of Congress, it will be seen that it does not conflict with the acts of Congress; it is rather in addition, or in aid of the objects of those laws.

III. There are three classes of these cases appealed from the Supreme Court of Alabama, one of which was engaged in running from Mobile to Montgomery, one in towing vessels in and about the port of Mobile, and one between New Orleans and Montgomery. As to the two first boats mentioned, they are domestic vessels entirely, running on our own waters within our limits, and so regularly occupied and engaged, and not between the ports of different States. The mere fact, therefore, that they happened to have a coasting license on board, can't help them. The Supreme Court of the United States, in 14 Howard, 573, says: "These categories are, 1st, commerce with foreign nations; 2d, commerce among the

several States; 3d, commerce with the Indian tribes. Taking the term commerce in its broadest acceptation, supposing it to embrace not merely traffic, but the means and vehicles by which it is prosecuted, can it properly be made to include objects and purposes such as those contemplated by the law under review? Commerce with foreign nations must signify commerce, which in some sense is necessarily connected with those nations, transactions which, either immediately or at some stage of their progress, must be extra territorial. It can never be applied to transactions wholly internal," &c.

Mr. Justice NELSON delivered the opinion of the court.

This is a writ of error to the Supreme Court of the State of Alabama.

The suit was brought by the plaintiffs below, commissioners of pilotage of the harbor of Mobile, against the steamboat Bagaby, of which Sinnot, the defendant, was master, to recover certain penalties for a violation of the law of the State of Alabama, passed February 15, 1854, entitled "An act to provide for the registration of the names of steamboat owners."

The 1st section of the act provides that it shall be the duty of the owners of steamboats navigating the waters of the State, before such boat shall leave the port of Mobile, to file in the office of the probate judge a statement in writing, setting forth the name of the steamboat and of the owner or owners, his or their place or places of residence, and their interest therein, which statement shall be signed and sworn to by the owners, or their agent or attorney, and which statement shall be recorded by the said judge of probate; and, also, in case of a sale of said boat, it is made the duty of the vendee to file a statement of the change of ownership, his place of residence, and the interest transferred, which statement shall be signed by the vendor and vendee, his or their agent or attorney, and recorded in the office of the aforesaid judge.

The 2d section provides, that if any person or persons, being owner or owners of any steamboat, shall run, or permit the same to be run or navigated, on any of the waters of the State,

without having first filed the statement as provided by the act, he or they shall forfeit the sum of $500, to be recovered in the name of the commissioners of pilotage of the bay of Mobile, either by a suit against the owners or by attachment against the boat, the one half to the use of the commissioners, and the other half to the person or persons who shall first inform said commissioners.

The steamboat Bagaby in question was seized and detained under this act until discharged, on a bond being given to pay and satisfy any judgment that might be rendered in the suit. A judgment was subsequently rendered against the vessel in the city court of Mobile, for the penalty of $500, with costs, which, on an appeal to the Supreme Court was affirmed.

The material facts in the case are, that the steamboat was engaged in navigation and commerce between the city of New Orleans, in the State of Louisiana, and the cities of Montgomery and Wetumpka, in the State of Alabama, and that she touched at the city of Mobile only in the course of her navigation and trade between the ports and places above mentioned; that she was an American vessel, built at Pittsburgh, in the State of Pennsylvania, and was duly enrolled and licensed in pursuance of the laws of the United States, and had been regularly cleared at the port of New Orleans for the ports of Montgomery and Wetumpka, whither she was destined at the time of the seizure and detention under the act in question.

The plaintiffs in error, the master, and stipulators in the court below, insist that the judgment rendered against them is erroneous, upon the ground that the statute of the Legislature of the State of Alabama is unconstitutional and void, it being in conflict with that clause in the Constitution which confers upon Congress the power "to regulate commerce with foreign nations and among the several States," and the acts of Congress passed in pursuance thereof. The act of Congress relied on is that of the 17th February, 1793, providing for the enrolment and license of vessels engaged in the coasting trade. The force and effect of this act was examined in the case of Gibbons v. Ogden, (9 Wh., pp. 210, 214,) and it was there held that vessels enrolled and licensed in pursuance of it had con-

ferred upon them as full and complete authority to carry on this trade as was in the power of Congress to confer.

The Chief Justice says, (speaking of the 1st section:) "This section seems to the court to contain a positive enactment that the vessels it describes shall be entitled to the privileges of ships or vessels employed in the coasting trade. These privileges cannot be separated from the trade, and cannot be enjoyed unless the trade may be prosecuted." Again, the court say, to construe these words otherwise than as entitling the ships or vessels described to carry on the coasting trade would be, we think, to disregard the apparent intent of the act. And again, speaking of the license provided for in the 4th section, the word "license" means permission or authority; and a license to do any particular thing is a permission or authority to do that thing, and, if granted by a person having power to grant it, transfers to the grantee the right to do whatever it purports to authorize. It certainly transfers to him all the right which the grantor can transfer, to do what is within the terms of the license.

The license is general in its terms, according to the form given in the act of Congress: "License is hereby granted for the said steamboat (naming her) to be employed in carrying on the coasting trade for one year from the date hereof, and no longer."

In the case already referred to, it was denied in the argument that these words authorized a voyage from New Jersey to New York. The court observed, in answer to this objection: It is true that no ports are specified; but it is equally true that the words used are perfectly intelligible, and do confer such authority as unquestionably as if the ports had been mentioned. The coasting trade is a term well understood. The law has defined it, and all know its meaning perfectly. The act describes with great minuteness the various operations of vessels engaged in it; and it cannot, we think, be doubted that a voyage from New Jersey to New York is one of those operations.

On looking into the act of Congress regulating the coasting trade, it will be found that many conditions are to be complied

with by the owners of vessels, before the granting of the enrol ment or license. 1. The vessel must possess the same qualifications, and the same requisites must be complied with, as are made necessary to the registering of ships or vessels engaged in the foreign trade by the act of December 31, 1792. These con ditions are many and important, as will be seen by a reference to the act. 2. A bond must be given by the husband, or managing owner, and the master, with sureties to the satisfaction of the collector, conditioned that such vessel shall not be employed in any trade by which the United States shall be defrauded of its revenues; and also the master must make oath that he is a citizen of the United States; that the license shall not be used for any other vessel or any other employment than that for which it is granted, or in any trade or business in fraud of the public revenues, as a condition to the granting of the license. These are the guards and restraints, and the only guards and restraints, which Congress has seen fit to an nex to the privileges of ships and vessels engaged in the coasting trade, and upon a compliance with which, as we have seen, as full and complete authority is conferred by the license to carry on the trade as Congress is capable of conferring.

Now, the act of the Legislature of the State of Alabama im- poses another and an additional condition to the privilege of carrying on this trade within her waters, namely: the filing of a statement in writing, in the office of the probate judge of Mobile county, setting forth: 1. The name of the vessel; 2. The name of the owner or owners; 3. His or their place or places of residence; and 4. The interest each has in the vessel. Which statement must be sworn to by the party, or his agent or attorney. And the like statement, mutatis mutandis, is required to be made each time a change of owners of the vessel takes place. Unless this condition of navigation and trade within the waters of Alabama is complied with, the vessel is forbidden to leave the port of Mobile, under the penalty of $500 for each offence.

If the interpretation of the court, as to the force and effect of the privileges afforded to the vessel by the enrolment and license in the case of Gibbons *v.* Ogden, are to be maintained,

it can require no argument to show a direct conflict between this act of the State and the act of Congress, regulating this trade. Certainly, if this State law can be upheld, the full enjoyment of the right to carry on the coasting trade, as heretofore adjudged by this court, under the enrolment and license, is denied to the vessel in question.

If anything further could be necessary, we might refer to the enrolment prescribed by the act of Congress, by which it is made the duty of the owner to furnish, under oath, to the collectors, all the information required by this State law, and which is incorporated in the body of the enrolment. Congress, therefore, has legislated on the very subject which the State act has undertaken to regulate, and has limited its regulation in the matter to a registry at the home port.

It has been argued, however, that this act of the State is but the exercise of a police power, which power has not been surrendered to the General Government, but reserved to the States; and hence, even if the law should be found in conflict with the act of Congress, it must still be regarded as a valid law, and as excepted out of and from the commercial power.

This position is not a new one; it has often been presented to this court, and in every instance the same answer given to it. It was strongly pressed in the New York case of Gibbons *v.* Ogden. The court, in answer to it, observed: "It has been contended, that if a law passed by a State, in the exercise of its acknowledged sovereignty, comes in conflict with a law passed by Congress in pursuance of the Constitution, they affect the subject and each other, like equal opposing forces." But, the court say, the framers of the Constitution foresaw this state of things, and provided for it, by declaring the supremacy not only of itself, but of the laws made in pursuance of it. The nullity of any act inconsistent with the Constitution is produced by the declaration that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties, is to such acts of the State Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged State powers, interfere with or are contrary

to the laws of Congress, made in pursuance of the Constitution, or some treaty made under the authority of the United States. In every such case, the act of Congress or treaty is supreme; and the law of the State, though enacted in the exercise of powers not controverted, must yield to it. The same doctrine was asserted in the case of Brown *v.* the State of Maryland, 12 Wh., pages 448, 449, and in numerous other cases. (5 How., pages 573, 574, 579, 581; 2 Peters, 251, 252; 4 Wh., pages 405, 406, 436.)

We agree, that in the application of this principle of supremacy of an act of Congress in a case where the State law is but the exercise of a reserved power, the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or consistently stand together; and, also, that the act of Congress should have been passed in the exercise of a clear power under the Constitution, such as that in question.

The whole commercial marine of the country is placed by the Constitution under the regulation of Congress, and all laws passed by that body in the regulation of navigation and trade, whether foreign or coastwise, is therefore but the exercise of an undisputed power. When, therefore, an act of the Legislature of a State prescribes a regulation of the subject repugnant to and inconsistent with the regulation of Congress, the State law must give way; and this, without regard to the source of power whence the State Legislature derived its enactment.

This paramount authority of the act of Congress is not only conferred by the Constitution itself, but is the logical result of the power over the subject conferred upon that body by the States. They surrendered this power to the General Government; and to the extent of the fair exercise of it by Congress, the act must be supreme.

The power of Congress, however, over the subject does not extend further than the regulation of commerce with foreign nations and among the several States. Beyond these limits the States have not surrendered their power over the subject, and may exercise it independently of any control or interference of the General Government; and there has been much

controversy, and probably will continue to be, both by the bench and the bar, in fixing the true boundary line between the power of Congress under the commercial grant and the power reserved to the States. But in all these discussions, or nearly all of them, it has been admitted, that if the act of Congress fell clearly within the power conferred upon that body by the Constitution, there was an end of the controversy. The law of Congress was supreme.

These questions have arisen under the quarantine and health laws of the States—laws imposing a tax upon imports and passengers, admitted to have been passed under the police power of the States, and which had not been surrendered to the General Government. The laws of the States have been upheld by the court, except in cases where they were in conflict, or were adjudged by the court to be in conflict, with the act of Congress.

Upon the whole, after the maturest consideration the court have been able to give to the case, we are constrained to hold, that the act of the Legislature of the State is in conflict with the Constitution and law of the United States, and therefore void.

The judgment of the court below is reversed.