GENERAL ELECTRIC COMPANY,
Plaintiff,

v.

NEW YORK STATE ASSEMBLY COM-
MITTEE ON GOVERNMENTAL OP-
ERATIONS et al., Defendants.

No. 75–CV–558.

United States District Court,
N. D. New York.

Dec. 31, 1975.

Bond, Schoeneck & King, Syracuse, N.Y., for plaintiff; Hughes, Hubbard & Reed, Jerome G. Shapiro, New York City, Charles A. Schoeneck, Jr., Syracuse, N.Y., Michael P. Shanley, Bath, N.Y., Ruth Kessler Toch, Sol. Gen., Peter J. Dooley, Jr., Asst. Atty. Gen., Albany, N.Y., of counsel.

Louis J. Lefkowitz, Atty. Gen. of the State of New York, Albany, N.Y., for New York State Dept. of Law; Arthur J. Harvey, Albany, N.Y.

Harvey & Harvey, Albany, N.Y., Joseph B. Robison, New York City, of counsel, for amicus curiae The American Jewish Congress.

## MEMORANDUM–DECISION and ORDER

### JAMES T. FOLEY, Chief Judge.

On November 17, 1975, a subpoena was served upon plaintiff the General Electric Company (hereinafter "GE") issued by Joseph F. Lisa, as Chairman of the New York State Assembly Subcommittee on Human Rights. ("Subcommittee"). Assemblyman Lisa is also Chairman of the parent committee, the New York State Assembly Standing Committee on Governmental Operations. That subpoena commanded the appearance of officers of GE who were to bring documents and materials:

> containing any boycott or blacklist conditions which you may have been requested to comply with, and all correspondence relating to such requests . . . and any guidelines, policies or regulations which you have adopted with respect to exporting or importing which contain any references to blacklist or boycott provisions, in your possession, custody or control.
> (Order to Show Cause, Exhibit A, filed Nov. 18, 1975).

The purpose of this investigation was detailed in a resolution of the New York State Assembly on November 25, 1975, and to summarize is to determine the effects of the so-called "Arab Boycott" in New York State, to educate the public accordingly, and to monitor and otherwise evaluate new legislation passed to eradicate discrimination against citizens of New York State in terms of such boycotts or blacklisting because of race, color, creed or national origin. See Chapter 662 of the Laws of 1975 of the State of New York.

In an effort to resist complying with this first subpoena which was returnable November 19, 1975, GE by its attorneys filed an application for an Order to Show Cause and Temporary Restraining Order on November 18, 1975. After a meeting and conference in my chambers in Albany with the attorneys for both parties, I signed on that date the Order to Show Cause, making plaintiff's motion for a preliminary injunction returnable on December 1, 1975. The attorneys for the defendants consented to withhold action on the subpoena issued to GE until the motion could be heard by this Court.

By agreement of the attorneys, thereafter, this return date was adjourned to December 15, 1975, at which time oral argument was heard in open court on the issues presented. This adjournment was initiated at the request of defendants and agreed to by stipulation dated November 26, 1975. The resolution was passed on November 25, 1975, and this subpoena to GE was reissued on December 4, 1975, superseding and replacing the previous one and it was made returnable on December 17, 1975. The subsequent subpoena differed in specifying that the materials and information sought would involve only that dated January 1, 1974 and later. The new subpoena contains a General Statement of the Subject of the Investigation identifying it as:

> An inquiry into the effect of boycott and blacklist discriminatory practices, specifically, the so-called Arab boycott, on activities of individuals and institutions located within the State of New York.

Amended Complaint, Par. 14A.

At the December 15th hearing on the motion for a preliminary injunction, Assistant Attorney General Dooley, representing as counsel all the defendants, again consented, and commendably so, to forebear from taking action on the latest subpoena or schedule hearings that might involve GE until January 5, 1976, in order to afford sufficient time for this Court to deliberate upon and decide whether the preliminary injunctive relief sought by GE should be granted or denied. Also with the consent of all parties, leave of this Court was given to the American Jewish Congress to file a brief, amicus curiae, to oppose the motion for a preliminary injunction. The appreciation of the Court is expressed for the depth and quality of the amicus brief that was

submitted in a short period of time and together with the comprehensive briefs submitted by the parties pointed up the complex constitutional issues involved.

The criteria by which this motion for a preliminary injunction must be evaluated are clearly established in this circuit:

[t]he settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Sonesta Int'l Hotels Corp. v. Wellington Associates*, 483 F.2d 247, 250 (2d Cir. 1973); *see also Gulf & Western Industries, Inc. v. The Great Atlantic & Pacific Tea Co.*, 476 F.2d 687, 692–93 (2d Cir. 1973); *Dopp v. Franklin National Bank*, 461 F.2d 873, 878 (2d Cir. 1972).

After study of the substantial submissions presented by both sides, it is my judgment that plaintiff has failed to show that any of these factors are satisfied to warrant the grant of a preliminary injunction, truly extraordinary in that it would stop a state legislative inquiry and hearings.

After the Order to Show Cause and Temporary Restraining Order application was signed on November 18, 1975, the plaintiff GE filed an Amended Complaint on December 10, 1975. The jurisdiction alleged in the original Complaint was added to by invoking 28 U.S.C. §§ 1331 and 1337 as proper jurisdictional support. There also is clarification of recent federal revision of pertinent federal regulations.

The amended complaint is lengthy and paragraphs 15 and 18 of it detail the reasons why GE contends the purposes of the subcommittee's inquiry are illegal and unconstitutional and also the injury that will be caused to its business interests. Five claims are set forth in counts for the requested relief of a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202, to declare the investigation by the subcommittee in violation of the Constitution of the United States and to declare the subpoena void; to enjoin the investigation with respect to the instant subpoena and with regard to the conduct of GE. The claims alleged in the numbered counts are: Count I charges the subpoena and inquiry are impermissible regulations that are disruptive of and constitute interference with the foreign policy and foreign commerce of the United States violative of the United States Constitution; Count II is to the effect that the Supremacy Clause of the United States Constitution and the Export Administration Act of 1969, as amended, preempt this field and thereby preclude this proposed State inquiry and hearings; Count III claims that the inquiry and subpoena are not related to a proper legislative purpose and this violates the due process clause of the Constitution; Count IV alleges that the State legislative action will "chill" communications of GE with others in violation of the First Amendment; Count V refers to Count III with claims that the subpoena can only be issued for information relevant to consideration of legislation within the jurisdiction of the subcommittee.

The claimed injury as detailed in the amended complaint is that the investigation threatens to deprive GE of property without due process of law. The "property" that apparently is threatened with loss and that GE treats most seriously is that a diminution in GE's reputation will result from "distortions of fact in the news media including the press", "public accusations by those conducting the inquiry", "injurious emotional reactions by members of the consuming public to such distortions", "harassment by executive and administrative agencies", and resulting pressure to cease engaging "in lawful conduct in foreign commerce". *See* Amended Complaint ¶ 18.

The principal substantive claims as noted are made under the Supremacy Clause, Due Process and Commerce Clauses of the Constitution to wit: that the investigation is beyond the authority of the New York State Legislature through its subcommittee because the investigation of boycotting and blacklisting involving United States corpo-

rations that deal in foreign commerce is in an area of exclusive federal concern; that such an investigation would constitute an undue burden on foreign commerce; and finally, that the control of boycotting and blacklisting involving American companies in foreign trade has been wholly occupied and thereby preempted by the federal government, especially in light of recent regulations promulgated by the United States Department of Commerce. *See* 40 Fed.Reg. 54769–71, November 26, 1975, revising 15 C.F.R. Part 369. The two remaining claims, that the investigation violates rights of communication and association protected by the First Amendment and that the subpoena violates New York State Law, will be dealt with at the end of this discussion.

■ The merit of these claims ultimately being established successfully, in my judgment, is very doubtful. The likelihood of success and the possible existence of meritorious questions in need of preservation until hearing or trial for a permanent injunction are certainly below the required threshold showing necessary to grant a preliminary injunction. The relief requested here in terms of the injunction sought has often been characterized as drastic relief by the federal courts. In the context of a federal court restraining a legitimate and duly appointed committee of a state legislature from discharging its responsibilities, to my mind, fits within this drastic characterization. Federal courts are loathe to interfere with the legitimate activities of a state legislature if an investigation is reasonably within the province of state concern. *Tenney v. Brandhove,* 341 U.S. 367, 378, 71 S.Ct. 783, 95 L.Ed. 1019 (1951); *Fischler v. McCarthy,* 117 F.Supp. 643 (S.D.N.Y.1954), *aff'd on other grounds,* 218 F.2d 164 (2d Cir. 1954) (per curiam). It should be emphasized that the challenge here is not against a State statute but seemingly contests the right and power of the State Legislature to determine whether legislation is needed, and if so and already enacted, to determine if it is fulfilling its purposes. Fundamentally, we have presented here the right of a state to require the production of corporate records of a state chartered corporation in an inquiry to determine whether corporate activities violate state policy and the highest judicial authority has ruled that this state right in this respect remains unimpaired. *Uphaus v. Wyman,* 360 U.S. 72, 77, 79 S.Ct. 1040, 3 L.Ed.2d 1090 (1959). Further, to my mind, it is consonant with and an important and integral process of the legislative function to follow up laws enacted to see if they fulfill their purposes or if they cause unexpected and injurious consequences that would lead to consideration to amend or repeal the law.

The doctrine of preemption is one that excludes usually an existent state statute from interfering with actions of the federal government. Really, the contentions of plaintiff GE as it itemizes them involve the application of this doctrine. GE says (1) the investigation is being conducted in an area of federal concern; (2) the field has been occupied by the Federal Government; (3) the investigation if permitted to continue would constitute a burden on interstate commerce. The preemption problem brings into play the proper maintenance of the federal-state relationship and domain in our system of government and has received concentrated and comprehensive federal attention for many years. I have had my own experience in a major case. *See Chrysler Corporation v. Tofany,* 419 F.2d 499 (2d Cir. 1969).

■ Supreme Court Justice Felix Frankfurter wrote extensively and perceptively on both sides of the question, i. e., whether the federal government should preclude State legislative involvement. *See Bethlehem Steel Co. v. New York State Labor Relations Board,* 330 U.S. 767, 778–80, 782–84, 67 S.Ct. 1026, 91 L.Ed. 1234 (1947), (separate opinion of Frankfurter, J.); *Youngstown Sheet & Tube Co. v. Bowers,* 358 U.S. 534, 551–553, 555–560, 564–566, 574–575, 79 S.Ct. 383, 3 L.Ed.2d 490 (1959), (Frankfurter, J. dissenting). In *Bethlehem,* in a separate opinion, he favored the State cautioning that federal legislation should be construed so as not needlessly to forbid preex-

isting State authority so as to respect our federal system, and any indulgence in construction should be in favor of the States because Congress can speak with drastic clarity whenever it chooses to assume full federal authority, completely displacing the State authority. He pointed to the phraseology in *Sinnot v. Davenport,* 22 How. 227, 243, 16 L.Ed. 243 (1859), "the repugnance or conflict should be direct and positive, so that the two acts could not be reconciled or constantly stand together." In Youngstown, the Justice dissented in favor of full federal control decrying that the court was disregarding the absolute ruling of *Brown v. Maryland,* 12 Wheat. 419, 6 L.Ed. 678 (1827) that a State may not tax foreign imports. In *Freeman v. Hewit,* 329 U.S. 249, at p. 252, 67 S.Ct. 274, 276, 91 L.Ed. 265 (1946), pertinent and applicable to the decision here: "Suffice it to say that especially in this field opinions must be read in the setting of the particular cases and as the product of preoccupation with their special facts." It is these guides that are applicable in the situation here because of an unusual fact situation involving governmental interests of the highest order. I find that the field of civil rights and the protection of the citizens of a state by their state legislature against boycotting and blacklisting by companies incorporated and licensed to do business in that state are not inconsistent with the similar actions taken on a national and international level by the federal government. Any challenge to the contrary has been squarely rejected by the United States Supreme Court. In *Railway Mail Association v. Corsi,* 326 U.S. 88, 65 S.Ct. 1483, 89 L.Ed. 2072 (1945) the Court termed such a contention as a "distortion of the policy manifested in . . . [the Fourteenth] [A]mendment, which was adopted to prevent state legislation designed to perpetuate discrimination on the basis of race or color." *Id.* at 93–94, 65 S.Ct. at 1487. In a concurring opinion, Mr. Justice Frankfurter eloquently stated the point:

> Elaborately to argue against this contention is to dignify a claim devoid of constitutional substance. . . . a State may choose to put its authority behind one of the cherished aims of American feeling by forbidding indulgence in racial or religious prejudice to another's hurt. To use the Fourteenth Amendment as a sword against such State power would stultify that Amendment. Certainly the insistence by individuals on their private prejudices as to race, color or creed, in relations like those now before us, ought not to have a higher constitutional sanction than the determination of a State to extend the area of non-discrimination beyond that which the Constitution itself exacts.

*Id.* 326 U.S. at 98, 65 S.Ct. at 1489. The civil rights of the citizens of the United States are and have been properly the subject and concern of both the federal and state governments and it is difficult, if not impossible, to imagine how laws concededly similar in purpose and coordinate in their content could be preempted or exclusively occupied by statutes or actions of the federal government. *Colorado Anti-Discrimination Commission v. Continental Air Lines, Inc.,* 372 U.S. 714, 722–25, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963), *Bob-Lo Excursions Co. v. Michigan,* 333 U.S. 28, 37, 68 S.Ct. 358, 92 L.Ed. 455 (1948). Racial discrimination or prejudice would be best eliminated or curbed by the full exercise of the federalism that is such an important feature of our form of democratic government.

■ The plaintiff, in my judgment, has failed to clearly show the conflict between these statutes and such cannot be left to implication. *Huron Portland Cement Co. v. City of Detroit,* 362 U.S. 440, 443, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960); *Fitzgerald v. Catherwood,* 388 F.2d 400, 403 (2d Cir. 1968), *cert. denied,* 391 U.S. 934, 88 S.Ct. 1846, 20 L.Ed. 854 (1968). Civil Rights statutes occupy a special and preferred position in our jurisprudence and mere inquiry by the state into the existence of discrimination within its borders can only be consistent and supportive of the principles embodied in the Constitution and of our national policy in general. Given the cherished status which our nation accords to civil rights,

for a state to adopt "the national purposes as its own purposes" is certainly not grounds for objection *per se. Cf. Gilbert v. Minnesota,* 254 U.S. 325, 330–31, 41 S.Ct. 125, 127, 65 L.Ed. 287 (1920).

GE's position in regard to the subpoena and inquiry acting as a burden on foreign commerce is equally without substantial merit in terms of the likelihood of success. Although Congress might regulate the foreign end of the stream of commerce exclusively, this fact does not prohibit the states from exercising their police powers on the other end of the stream, i. e., within their own borders. *Florida Lime & Avocado Growers v. Paul,* 373 U.S. 132, 145, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963); *Head v. New Mexico Board of Examiners in Optometry,* 374 U.S. 424, 428, 83 S.Ct. 1759, 10 L.Ed.2d 983 (1963); *cf. Merrill, Lynch, Pierce, Fenner and Smith, Inc. v. Ware,* 414 U.S. 117, 94 S.Ct. 383, 38 L.Ed.2d 348 (1973); *Goldstein v. California,* 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). GE's claims in this regard are novel. GE contends that its business is in itself no less than an instrument of United States foreign policy because it uniquely can and does supply such commodities as jet engines and nuclear reactors to other nations. As such, it is contended that GE is immune from control and, indeed, from inquiry by the state. Although somewhat vague in specifics, GE argues that this inquiry will instigate improper media reporting and the media will necessarily distort the actual involvement, if any, of GE in boycotting and blacklisting activities thereby impairing such commerce with foreign nations. If this be so, I would think GE will have full opportunity, given its substantial means, to inform the public fully of its actual and true involvement, thus correcting the feared distortions. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

It is difficult to understand how denial of any participation in boycotting and blacklisting activities, if that is GE's position, can conflict with a federal policy alleged to preempt the area by prohibiting such activities. On the one hand, GE would be in violation of neither federal nor state policy, and would be, I think, in a position to comport with its obligations as a corporation in New York State, licensed to do business there, to supply useful information or advice on these practices and how they effect the citizens of New York. On the other hand, previous engagement in discriminatory activities, if any, even if only proscribed by federal law and regulations, might itself be a proper subject for state legislative consideration in terms of the license to do business or the corporate charter being affected by activities in violation of federal law or policy.

On the point of the potential irreparable harm, I find that no adequate showing has been made for two reasons. First, the inquiry by the subcommittee has not acted as yet to the detriment of GE. The controversy is thus not ripe for adjudication on the basis of anticipated questions or document production. *Pauling v. Eastland,* 109 U.S.App.D.C. 342, 288 F.2d 126, 128–29 (1960), *cert. denied,* 364 U.S. 900, 81 S.Ct. 233, 5 L.Ed.2d 194 (1960). The subcommittee simply has no powers of adjudication with respect to criminal or civil liabilities, nor powers to impose legal sanctions, nor can it deprive anyone of life, liberty, or property. Indeed, the subcommittee cannot take any affirmative action at all; its only purpose is to find facts and report to appropriate persons within the government and the general citizenry of the state. *See Hannah v. Larche,* 363 U.S. 420, 440–441, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960).

In the context, this subcommittee is an improbable source or cause of any irreparable injury recognized by the Constitution. According to the amended complaint, however, the irreparable harm consists of adverse publicity which, it is assumed therein, will be generated by these investigations. In support of this contention, GE has submitted several newspaper articles which it alleges are distortions of fact. Ironically, a good number of these articles were generated by virtue of the instant lawsuit rather than anything done by the subcommittee.

Contentions of irreparable injury such as these have been rejected by the Supreme Court holding that publicity is a natural consequence of investigations and does not illegitimatize the government proceedings.

Yet, the respondents contend, and the court below implied, that such procedures are required since the Commission's proceedings might irreparably harm those being investigated by subjecting them to public opprobrium and scorn . . . . That any of these consequences will result is purely conjectural. There is nothing in the record to indicate that such will be the case or that past Commission hearings have had any harmful effects upon witnesses appearing before the Commission. However, even if such collateral consequences were to flow from the Commission's investigations, they would not be the result of any affirmative determinations made by the Commission, and they would not affect the legitimacy of the Commission's investigative function.

Hannah v. Larche, supra, 363 U.S. at 443, 80 S.Ct. at 1514.

Furthermore, even conceding arguendo that press reports will to some extent contain inaccuracies and tend to the sensational, it is settled that this alone is no basis for constitutional objection. If it does occur, and with malice, GE as a private company can sue. Gertz v. Robert Welch, Inc., supra, 418 U.S. at 340–41, 94 S.Ct. 2997; New York Times v. Sullivan, 376 U.S. 254, 270–73, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In my judgment, this "claim emanates more from overzealousness than from proof indicating any substantial risk of damage to [GE's] reputation." Sonesta Int'l. Hotels Corp. v. Wellington Associates, supra, 483 F.2d at 254–55.

■ Finally, these considerations also apply to the tests for balancing of hardships and preservation of a substantial question for later trial. The lack of merit in the claims and the lack of irreparable harm apparent to me, particularly of any constitutionally recognized harm, provide sufficient basis for denying the motion for a preliminary injunction. Predominately, the reasons that govern are that the elimination of discrimination on the basis of race, religion and national origin, is not one known by long and troubled experiences to be one for federal concern exclusively. I find nothing evident that the inquiry will alter or defeat our national foreign policy. United States v. Pink, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

■ The remaining claims of violations of rights under the First Amendment and of the validity of the subpoena under state law do not merit extensive consideration. It is unclear to me how these investigations will impair rights of association and free speech as we regard those rights under settled law. These considerations do not alter the failure to meet the standards outlined previously for the grant of a preliminary injunction.

■ In conclusion, I find the likelihood of success on the merits to be unsatisfactory for the issuance of a preliminary injunction for the reasons stated herein. The anticipated adverse publicity provides no constitutional foundation for injunctive relief and is supported by little more than conjecture at this point. The challenge here is made mainly to the right of the New York State Legislature to find out for itself whether discriminatory practices are used by New York corporations within New York borders, and their effect on the citizens of New York State in the past, present and future. This is certainly within the legitimate police powers of the state under principles of settled law. My findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a) are set forth in this decision.

The motion for a preliminary injunction is denied and the Order to Show Cause dismissed. This order of dismissal and denial is stayed until January 7, 1976 at 2:00 p. m., and then to expire, in order to allow the plaintiff sufficient time, if it be so advised, to file a notice of appeal and to apply to the Court of Appeals, Second Circuit, for further stay pursuant to the Federal Rules of

Appellate Procedure 8(a). The purpose is to continue the agreement made by Assistant Attorney General Dooley for the defendants on December 15, 1975—which provided not to enforce the subpoena or to conduct hearings involving plaintiff GE— until the appellate procedures can be invoked.

It is so Ordered.