State v. Delaware, Lackawanna, and Western R. R. Co.

THE STATE OF NEW JERSEY v. THE DELAWARE, LACKA-
WANNA, AND WESTERN RAILROAD COMPANY.

THE STATE OF NEW JERSEY v. THE NEW YORK AND
ERIE RAILWAY COMPANY.

1. A law laying a special tax on the business of foreign corporations, regularly doing business in this state, transporting passengers and merchandise across the state, from and to foreign states, such tax being graduated by the number of the passengers and the weight of the goods carried, is not an infringement of that clause of the constitution of the United States which gives to congress the power to regulate commerce among the several states.
2. Such commerce is not of such a national character, that a state may not regulate it in the manner complained of, without violating the constitution of the United States.
3. Such tax is merely a tax upon the company, in proportion to the number of passengers and weight of merchandise transported by them within this state, and not a regulation of commerce among the states.
4. A foreign corporation, upon which has been conferred by the legislature of this state the power to purchase and hold lands in this state, does not, by reason of such legislative action, lose its foreign, and acquire a domestic character. A corporation can be properly said to exist only in the state which created it.

These suits were brought by the state to recover the amount of the transit duty claimed to be due from the defendants, respectively, for the passengers, goods, wares, and merchandise transported by them, or for them, on certain railroads in this state, a distance exceeding ten miles.

The claims are made by the state, under the 10th section of the act of March 28th, 1862, entitled "a further supplement to an act entitled, an act concerning taxes," approved April 14th, 1846.

This section provides, that all corporations regularly doing business in this state, and not being corporations of this state, shall be assessed and taxed for and in respect of the business so by them done and transacted in this state, in manner following, that is to say : " every such company so doing business shall pay a transit duty of three cents on every passenger,

and two cents on every ton, of goods, wares, and merchandise, or other articles, carried or transported by or for such company, or on any railroad or canal in this state, for any distance exceeding ten miles, except passengers and freight transported exclusively within this state, &c.; and such transit duty for railroad or canal transportation shall be paid to the treasurer of this state within the month of January, in each year, for the transportation of the previous year; and it shall be the duty of the president or treasurer of every such company to furnish to the treasurer of the state, by or before the third Tuesday of January, annually, under oath or affirmation, a full and true account of the number of passengers and of the number of the tons of goods, wares, and merchandise, and other articles, so carried or transported as aforesaid."

An issue was made up between the state and the defendants, respectively, and were cases agreed on to be submitted to the Supreme Court, for their decision without a jury, according to the provisions of the act of March 13th, 1862, entitled "an act relative to taxes due from incorporated companies in this state," and a supplement thereto, passed March 11th, 1863.

It appeared that the Delaware, Lackawanna, and Western Railroad Company was incorporated by the state of Pennsylvania, and the New York and Erie Railway Company was incorporated by the state of New York, and that both companies carried and transported through the state of New Jersey, for a distance of more than ten miles, on railroads in this state, and operated by the said defendants, under lease or agreement made or entered into by said defendants with the companies owning said railroads, and so, by transhipment to New York and other places, passengers and freight, brought over their roads in New York and Pennsylvania and other connecting roads from the west.

The defendants claimed—

*First.* That they were not within the provisions of the act of 1862; that owning property and using roads in

this state by its permission, they could not be considered foreign corporations within the meaning of the act; and

*Secondly*. That if within its provisions, that the act itself is an infringement of that part of the constitution of the United States which confers upon congress the power to regulate commerce with foreign nations and among the several states, &c.; that the power of congress is exclusive, and cannot be controlled or interfered with by the states.

All the facts contained in the cases agreed on, having any practical bearing on the questions submitted and decided, will be found referred to by the court in their opinion.

Both causes, involving the same general principles, were argued together at the November term, 1863.

For the state, *F. T. Frelinghuysen*, attorney general.

For the several defendants, *Jehiel G. Shipman, David A. Depue*, and *Isaac W. Scudder*.

At this term, February, 1864, the following opinions were delivered.

HAINES, J.    This cause comes to us on a special case, made pursuant to the act of March 13th, 1862, relative to taxes due from incorporated companies in this state, and its supplement, of March 11th, 1863, making it applicable to incorporated companies, whether in this state or not.    The object of the suit is to test the validity of a claim for tax, alleged to be due to the state from the defendants, under the 10th section of the act of 28th March, 1862, which is a supplement to the act concerning taxes.

This 10th section provides, "that all corporations regularly doing business in this state, and not being corporations of this state, shall be assessed and taxed for and in respect of the business so by them done and transacted in this state, in manner following, that is to say : every such company shall

pay a transit duty of three cents on every passenger, and two cents on every ton of goods, wares, and merchandise, or other articles, carried or transported by or for such company on any railroad, or carried in this state for any distance exceeding ten miles, except passengers and freight transported exclusively within this state."

The case shows the number of passengers and tons of freight so transported by the defendants; whether they are liable to be assessed and taxed for the business so done by them, is the question to be decided.

It is insisted that this company is not liable to the tax claimed—first, because it is not a company regularly doing business in this state. But the case shows that they are the lessees of the Warren railroad, for the transportation of coal and other merchandise, and of passengers, a distance exceeding ten miles within this state; and if this be so, they are a corporation regularly doing business in this state.

It is further objected that there is no liability on the defendants, because they are not within the terms of the description, "not being corporations of this state;" that the legislature, by authorizing the defendants to purchase and hold lands here, and to lease the Warren railroad, created them a corporation of this state; that the company thereby lost its foreign, and acquired a domestic character. By the state of the case, it appears that the Delaware, Lackawanna, and Western Railroad Company was created by an act of the legislature of Pennsylvania. And the act of New Jersey, conferring upon it power to purchase and hold lands in this state, calls it a corporation existing under the laws of Pennsylvania. The state which creates a corporation gives it a local habitation as well as a name, and there only it can properly be said to exist. Its arms and operations may extend beyond, but the body, the source of its vitality, is limited to the place of its nativity. Powers and privileges may be conferred by another state, but that does not divest the corporation of its foreign character. The rights of citizenship

State v. Delaware, Lackawanna, and Western R. R. Co.

conferred upon an alien make him a naturalized, but not quite a native born citizen.

In the case of *The Phillipsburg Bank* v. *The Lackawanna Railroad Company*, 3 *Dutcher* 206, on a motion to quash a writ of attachment issued against the latter, it was urged that the act authorizing the defendants to hold land and to transact business within this state did, of necessity, constitute them a domestic corporation, as much so as if chartered by the laws of this state. But this court held that the legislature has clearly distinguished between the creation and the recognition of a corporation. That the one refers clearly to a domestic corporation, having its place within this state and subject in all respects to the control of its laws, the other to a foreign corporation, having its place within another state, deriving its being from and subject to the control of the laws of such state, but recognized by the laws of this state, as having power to exercise its franchises or transact its business here.

These objections cannot prevail, and it must be held that the defendants are one of the corporations contemplated by the act under which the tax is claimed.

A more serious question is raised upon the constitutionality of the act. It is insisted, by the counsel of the defendants, that it is in violation of the 8th section of the first article of the constitution of the United States, which confers upon the congress of the United States the power to regulate commerce with foreign nations and among the several states.

It is claimed that this power conferred on congress, has been adjudged to be exclusive, and that any attempt on the part of a state, to regulate commerce among the states by interfering with its freedom, or making hostile or burthensome discriminations, is an infringement of that power and void; and that, in the strong and terse language of Judge Grier, in the *Passenger cases*, 7 *How.* 464, "congress has regulated commerce and intercourse between the states by willing that it shall be free." If this position is conceded, it must be with considerable modification.

State v. Delaware, Lackawanna, and Western R. R. Co.

By the term commerce, is meant not traffic only, but every species of commercial intercourse, every communication by land or by water, foreign and domestic, external and internal. Hence the power to regulate it must, in the language of Judge Curtis, in *Cooley* v. *The Board of Wardens of Philadelphia*,* " embrace a vast field, containing not only many, but exceedingly various subjects, quite unlike in their nature; some imperatively demanding a single uniform rule operating equally on the commerce of the United States in every port, and some as imperatively demanding that diversity which alone can meet the local necessities of navigation," and it may be added, the local necessities of domestic intercourse. " Where the subjects of such intercourse," continues Judge Curtis, " are in their nature national, and require a uniform system of regulation, they may justly be said to require exclusive legislation by congress."

When commerce is of this national character, there is no constitutional or legal power in a state to interrupt, impede, or regulate it. But where it has not such national character, the states do many things to regulate it, and some that more or less affect commercial intercourse without any violation of the constitution.

Laws, for example, for the regulation of pilots and pilotage, are not questioned as to their constitutionality. The regulation of the fares and tolls on turnpikes, railroads, and ferries, even directly between two states, is wholly within the jurisdiction of the states, and such power has been continually exercised, and in the case of *The Chosen Freeholders of Hudson County* v. *The State*, 4 *Zab.* 730, it was held, by the Court of Errors, that the exercise of such power was in no wise repugnant to the provision of the constitution.

It is further insisted, that the act in question practically lays a tax upon imports and exports, and so violates the 10th section of the first article of the constitution of the United States, which provides that no state shall, without the consent of congress, lay any imposts or duties on imports or exports. If that be true, the act is clearly unconstitutional,

---

* 12 *How.* 299.

no consent of congress for that purpose having ever been given.

This leads to the important inquiry—does the act in question attempt to interrupt or to regulate commerce, or to impose duties or imposts on exports or imports?

It does not exclude from the state any class of persons or of property, or of vessels or other vehicles of transportation, as did the act of New York, which granted to certain individuals the exclusive use of its waters for navigation of vessels propelled by fire or steam, and which was declared to be unconstitutional in *Gibbons* v. *Ogden*, 9 *Wheat.* 1.

Nor does it prohibit or restrain the sale, and thereby tend to impede the importation of any article, by requiring the vendor to obtain a license to sell, as in *Brown* v. *The State of Maryland*, 12 *Wheat.* 419, and in the *License cases*, 5 *How.* 504.

It imposes no impost, tax, tribute, or duty, directly or indirectly, on passengers or goods, and is not within the principle of the *Passenger cases*, 7 *How.* 283.

Nor does it impede the export of any article, by requiring stamps upon bills of lading or otherwise, and is not within the ruling of *Almy* v. *The State of California*, 24 *How.* 169. It makes no discrimination between the property of citizens of this state or of other states; nor are the passengers or the owners of goods, or the goods themselves, in any wise made subject to the tax, or retarded by it.

The tax is laid upon the company without respect to the ownership of the goods, or to the residence of the passengers. It is not enforced by levy and distress; but is required to be paid by the company into the treasury of the state, and in default of payment, to be recovered by an action at law.

It is a tax upon the company "for and in respect of the business by them done and transacted within this state," computed by the tons of merchandise and numbers of passengers transported. There is no *ad valorem* clause; all goods are estimated by the ton, whether they consist of iron or gold, coals or diamonds, tow cloth or laces, vinegar or

wine. Had the act provided that the company should pay a certain sum for every car or every locomotive employed, the right to do so would hardly have been questioned.

The right to tax carriages habitually used in the state will not be denied. Had the act required the payment of a per centage on the earnings of the company from its operations here, it would have been within the principle on which incomes are assessed.

The tax in question is neither more nor less than a tax on the income of the company, from its business in this state, the easiest mode of ascertaining which, is by the company's annual statement of the number of passengers and of the tons of merchandise transported.

It imposes, it is true, this tax on a foreign corporation, and because it is foreign. Were it domestic, it would be taxed on its capital or its cost, and be subjected to a much greater burthen. But being foreign, it is relieved from the heavier duty. This corporation enjoys the franchise of the state; its property here and all its rights are under the protection of the laws of this state, and there is no reason why, in common with the corporations and citizens of the state, it should not bear its fair proportion of the expenses and burthens of the state government.

It may be that the rate of taxation is too high, and so operates unequally; but that is a matter of legislative action, and not of judicial construction. The remedy is to be found in the legislature, and not in the courts.

It is contended further, that the act in question is in violation of that clause of the constitution of New Jersey which forbids the passage of any law impairing the obligation of contracts; that the charter of the Warren Railroad Company imposes a certain tax on its capital, and exempts the company from any further or other tax; and that the tax imposed by this act is virtually a further tax on the Warren Railroad Company.

If it be admitted, for the sake of the argument, that the Warren Railroad Company, by an irrepealable contract in

their charter, are exempt from further taxation, and therefore within the exception of the 8th section of the act in question, it is difficult to perceive how this tax is laid upon them. It is not charged upon them, nor upon their property, nor does it diminish the value of their receipts for rent or otherwise. The defendants, by the terms of the lease of the road to them, are required "to pay and discharge all taxes, assessments, and impositions which shall or may be legally taxed, assessed, or imposed upon the premises and property" leased to them. An additional tax cannot affect the Warren Railroad Company.

The defendants, as lessees, can on that account claim no exemption. The tax is not on the Warren Railroad Company, nor upon their road, stock, property, or franchises. It is simply upon the defendants in respect of their profits and earnings by the transportation, in this state, of passengers and property. Were they not operating the road, and regularly doing business upon it, they would not be subject to the tax; but as they are lessees operating the road and regularly doing business upon it, they may with propriety be asked to pay something on the profits of the business, and to contribute something to the support of the government whose privileges they enjoy, and under whose protection and laws they prosecute their business.

The principle of the section of the act in question is not novel, nor its application without precedent.

By the act of February 4th, 1830, the Camden and Amboy Railroad and Transportation Company were required to pay to the state at the rate of ten cents for each passenger, and fifteen cents for each ton of merchandise, transported on their road. By subsequent acts, the payment for passengers was made applicable to those transported over the whole line of the road—to through passengers.

By the act of March 7th, 1832, the New Jersey Railroad and Transportation Company were required to pay a tax on their capital; and when thereupon any railroad should intersect or be attached to their road, so as to make a continued

railroad, carrying passengers across the state of New Jersey between the states of New York and Pennsylvania, then they were required to pay into the treasury of the state at the rate of eight cents for every passenger, and twelve cents for every ton of merchandise transported thereon.

Nor are these precedents confined to this state.

The legislature of Maryland, by an act of 1832, authorized the Baltimore and Ohio Railroad Company to construct a branch road from Baltimore to the city of Washington, fixed the fare of each passenger at two dollars and fifty cents; and then required the company to pay, semi-annually to the treasurer of the Western Shore of Maryland, one-fifth of the whole amount received for the transportation of passengers over their said branch road.

The legislature of Pennsylvania, by an act of 21st April, 1846, granted the assent of the state to the Baltimore and Ohio Railroad Company, to locate and construct a continuation of their railroad from the town of Cumberland, in the state of Maryland, to the city of Pittsburgh; and required the company to pay, every six months, into the treasury of the state, as a tax or duty on all tonnage, except the ordinary baggage of passengers transported on that continuation of their road, such tax as the legislature might impose, not exceeding three mills per ton per mile; and in addition thereto, a tax or duty on all passengers that may have passed, during each preceding six months, a distance of one hundred miles or more of said road between these points, at such rate as the legislature might direct, not exceeding fifty cents for each passenger, until the construction of a railroad connecting the Baltimore and Ohio railroad with the Cumberland Valley railroad, by the Cumberland Valley; after that, the tax or duty not to exceed twenty-five cents for each passenger.

By an act 26th March, 1846, the legislature of Pennsylvania granted authority to the New York and Erie Railroad Company, to extend their line of railroad from a point in the village of Port Jervis, in the state of New York, across the Delaware river, into the county of Pike, in the state of

Pennsylvania, and up the valley near the shore of the river, a distance not exceeding thirty miles; and the stock of the company, equal in amount to the cost of such construction in Pennsylvania, was made subject to taxation in the same manner and to the same amount as other similar property was or might be made subject. And the company was further required, after the completion and operation of their road to Dunkirk, or its connection with any railroad to Lake Erie, to pay into the treasury of Pennsylvania the annual sum of ten thousand dollars, on the penalty of forfeiture of the rights and privileges granted by the act.

In the state of New York, too, we find an act, as early as April 15th, 1817, respecting navigable communication between the great western and northern lakes and the Atlantic ocean; and for the purpose of raising a canal fund, various taxes were imposed, among others, "a tax of one dollar upon each steamboat passenger, for each and every trip or voyage such passenger may be conveyed on the Hudson river on board of any steamboat over one hundred miles; and half that sum for any distance less than one hundred miles and more than thirty miles."

These acts, except the last named, have long been in force, and public attention almost constantly directed to them. Great complaints, indeed, have been made by parties interested, and perhaps by others, against the mode of taxation. The acts of this state, particularly, have been the theme of much criticism, and afforded the subject of many a piquant joke and bitter sarcasm. All the acts referred to have been the subject of earnest discussion, as to their justice and expediency; but I am not aware of any question having been raised respecting the constitutionality of any of them.

It is said that these taxes were a part of the terms of incorporation, and a matter of contract entered into by the several companies, and the question of constitutionality thus avoided. But no contract respecting a regulation of commerce can make it constitutional. Consent can give neither jurisdiction nor constitutionality. Each act must stand upon its own merits, and fall for the want of them.

If legislative construction of a measure is of any value, we surely have it in the acts referred to. They are all based upon the principle, that a state may tax individuals or companies, who exercise privileges within the state, and are protected by its laws; and they emphatically declare that, by so doing no article of the constitution of the United States is violated. I am satisfied that the act in question in this case is not in violation of any clause of the constitution of the United States or of this state.

Whether it is expedient to impose the tax contemplated by the 10th section of this act, and by so doing to follow the precedents set by the states of Maryland, Pennsylvania, and New York, is a question to be determined by the maker, and not by the expounder of the law.

In my opinion, judgment should be rendered for the state on the case made.

VREDENBURGH, J., concurred.

VAN DYKE, J. By certain acts of the legislature of this state, the Paterson and Hudson River Railroad Company and the Paterson and Ramapo Railroad Company were severally incorporated, and authorized to construct railroads between Jersey City and the northerly line of this state, so that the whole together would form a continuous road between those points. Both these roads have been completed, and embrace a line of road through the state of a little more than thirty miles. These roads have, under the assent and sanction of our legislature, been leased to the Erie Railway Company, a corporation chartered by and belonging to the state of New York, and whose road extends from Piermont, on the Hudson river, to Dunkirk, on the southerly shore of Lake Erie. The company, by virtue of the leases aforesaid, and of the Union railroad, incorporated by the state of New York, are now using the roads so leased, in connection with their own, in transporting passengers, goods, wares, and

merchandise, between Dunkirk and the city of New York, into and through this state.

On the 28th day of March, 1862, our legislature passed an act concerning taxes, the 10th section of which is as follows, viz. :

"That all corporations regularly doing business in this state, and not being corporations of this state, shall be assessed and taxed for and in respect of the business so by them done and transacted in this state, in manner following, that is to say : every such company so doing business shall pay a transit duty of three cents on every passenger, and two cents on every ton of goods, wares, and merchandise, or other articles carried or transported by or for such company, on any railroad or canal of this state, for any distance exceeding ten miles, except passengers and freight transported exclusively within this state."

It appears that between the passage of this act and the 31st day of December of the same year, the tax or transit duty on the passengers and merchandise carried by the Erie Railway Company into or through this state, over the leased roads aforesaid, amounts to the sum of $18,824.25. To recover this sum, the proceedings in this case have been instituted.

Several reasons have been offered to show that this tax, or these transit duties, should not, and cannot be collected from the Erie Railway Company. I shall notice but one of them.

It is insisted that this act, and the enforcement of it, is a violation of the constitution of the United States; for that it is an interference with, and an attempt to regulate commerce among the several states, and also that it imposes a tax upon imports into, and exports from the state.

Among the many wise provisions of the constitution, is that which confides to the national congress, which usually includes the executive, the power to regulate commerce with foreign nations and among the several states. It is not difficult to see how much the national government might be embarrassed, and the states themselves imperiled, if each one

were permitted to make and establish its own laws and rules of trade and commerce with all the world, according to its own views of expediency. Nor is it difficult to perceive the strifes and feuds, and bitterness and possible collisions, in which the states might be involved with each other, if spiteful, vindictive, and retaliatory laws were permitted to be passed and executed with regard to each other, whenever passion or prejudice or self-aggrandizement should present a sufficient motive. The framers of the constitution, therefore, to protect the states from these extreme perils, wisely interposed between them the more discreet and deliberate power of congress. It is scarcely supposable, that a majority of that body would ever consent to give to any one state, or to its citizens exclusively, any material advantage over any of the rest.

This right to regulate commerce among the states, thus confided to congress, must also, of necessity, be exclusive, as much so as the right to regulate it with foreign nations; for the powers which the states granted to congress, they must be considered as having surrendered to the general government, and no longer to be exercised by them. No reservation on the part of the states seems to have accompanied this grant to congress; and if the states can exercise concurrent control with the congress in the matter before us, or until such time as congress shall interfere to prevent it, it is difficult to see why they may not also do so in all other similar cases; why they may not establish general laws of naturalization and laws of bankruptcy; why they may not coin and regulate the value of money, and fix the standard of weights and measures, establish post-offices and post roads, grant letters patent, declare war, and grant letters of marque and reprisal, and the like. These are powers granted to congress, and but few of them are in terms prohibited to the states; and yet they have always been considered as belonging exclusively to congress, with which the states had no right to interfere or attempt to regulate, whether congress had at all acted in the matter or not. If the states have

concurrent jurisdiction with congress to pass laws on the sub-
ject of commerce, then the congress has no power to annul
such laws; and if congress has power to annul them, it must
be because the states have no right to pass them; and if the
states have no right to pass them, the courts of the states
should not sustain them. But this question seems to be very
well settled by authorities which we are not at liberty to re-
sist, and I do not understand it to be denied.

Is, then, this act of our legislature, imposing the tax on
the passengers and property carried by the Erie Railway
Company into and through our state, or over more than ten
miles thereof, as before mentioned, and the effort to enforce
it, an attempt to regulate commerce among the several
states? It is conceded that the passengers and merchandise
carried into or through our state, the one way and the other,
by this New York railway company, are from most, if not
all the states of the Union. Now, commerce among the
several states unquestionably consists in the carrying of per-
sons or commodities from one state into another, whether it
be an adjoining one or not, for the purpose of business or
pleasure, or for the sale or exchange of such commodities, or
for the disposition of them in some other way. This is com-
merce, and it is commerce among the states, and it seems to
me to be precisely what the Erie Railway Company, through
its agents, its railroads, its conveyances, and its motive
power, are doing for all persons in the country who see fit to
employ it. It is thus aiding, by its great power, the people
of the different states, in carrying on their commerce and in-
tercourse with each other, as the constitution presumes they
will find it necessary or expedient to do; and any attempt on
the part of any one of the states, to obstruct or impede or
prevent such commerce, unless it be in some necessary po-
lice regulation, or to prescribe the terms and conditions on
which such commerce shall enter its limits, cross its territory,
or leave its borders, is necessarily an attempt to regulate, to
that extent at least, commerce among the states; a thing
which it cannot lawfully do. This act of the legislature does
undertake to prescribe and enforce the terms and conditions

on which this foreign railway company may carry persons and commodities within, across, and from our territories, not by making contracts with it for that purpose, but by the imposition of a tax, called a transit duty, upon every passenger and every ton of merchandise which it brings into or takes out of the state, provided the distance carried within the state exceeds ten miles.

It may be admitted, I think, for the purposes of this case at least, that the legislature may regulate the commerce which is carried on exclusively within the limits of the state; for this is not attempting to regulate or interfere with commerce among the *several* states. But the act in question does the exact contrary of this. It is careful not to tax the passengers or freight carried exclusively within the state, although they be carried from one side of it to the other, but it affects *only* the passengers and freight that are brought into the state, and those which are carried out of it into other states, and every farthing of the tax or transit duty claimed in this suit, has arisen on passengers and merchandise that have been brought into or carried out of the state; so that the act operates exclusively upon the commerce among the different states, which is the thing prohibited by the constitution of the United States. It is easy to see, if this law is sustained, how the entire commerce carried on in and through the state by this railway company, so far as it relates to the persons and property brought into the state and those that are carried out, may be wholly destroyed. For if the courts sustain the law, the company has no alternative but to pay the tax or to cease doing the business. For as there is no limit to the extent to which a tax may be imposed, if the right to assess it at all be conceded, it may be increased and extended to the destruction of the object on which it is made to operate; and if the state can lawfully impose a tax of three cents on a passenger, and two cents on a ton of merchandise, why may it not also impose a tax of ten cents, or twenty cents, or more on each, which would, of necessity, ruin and break up the entire commerce thus carried on; and

if it can thus tax it at will, why may it not prohibit it altogether? Can it be that the state has the power to do this? I cannot think so.

It is doubtless true that the state may refuse to permit railroads and canals to be constructed for the purpose of facilitating this kind of commerce; but this relates only to the particular modes of conveyance, and does not affect the right of the people to carry on the commerce itself by other modes of conveyance. But if the state *had* the right to prohibit these particular modes of conveyance, it is now too late to exercise that right. It has already granted the privilege, and the roads have been made and are in use. It has already consented to the leasing of these roads to the Erie Railway Company, and the leases have been executed and delivered. These New Jersey roads have already paid all the tax imposed upon them by their charters; and now, after having assented to all these arrangements, with a view to this very commerce among the states, the state undertakes to tax that commerce by the assessments under consideration.

It is insisted, however, that this is not a taxing of commerce among the several states, but a taxing of the business of the company. It is true that this is a taxing of the business of the company; but then the business of the company is the carrying on of commerce among the states, quite as much so as if the same thing was done by vessels navigating the waters of the country; so that whether we call it the one thing or the other, it brings us to the same conclusion. It is a tax and restraint upon the commerce among the states. The calling of things by different names cannot change the great thing itself.

It is doubtless true that the business of this railway company carried on in the state, as well as all its property permanently within its limits, may be taxed. But then the business thus taxed must be, I think, that which is confined exclusively to the state, and not that which is necessarily connected with business outside the state, such as the carry-

ing of merchandise, &c., from one to the other for sale or exchange. This is commerce *among* the states, and, as we have before seen, our act expressly excludes from its operation business of this company which relates exclusively to this state, and confines it exclusively to those passengers and that merchandise which enter from or go into other states : and this is what gives to the act its objectionable and unconstitutional feature.

There are some things which states may do, although they may, to some extent, affect commerce. They may pass laws for their own preservation. They may prevent the introduction of dangerous diseases, of crimes and criminals, and the various species of demoralization and pollution. Such acts are held to be not acts for the regulation of commerce, within the meaning of the constitution ; but they are laws for the preservation and protection of the people, in their internal affairs, from the evils which might otherwise be cast upon them, and are therefore termed internal police laws, and are such rights and powers as the states are held never to have surrendered.

So, too, the states may impose such burthens and restraints upon the traffic, on the part of its citizens, in articles that were once imports, after they have lost that character, and become broken up and mingled with the other private property in the state, as would discourage the importation of such articles, by which the nation would lose some revenue. But this is held to relate only to their own internal affairs, after they have become such, and not to commerce with foreign nations nor among the several states.

If the question before us were a new one, I should feel constrained, by the very clear and express language of the constitution itself, as well as by the urgent necessity which caused the provision to be inserted, to hold our act to be repugnant to that great instrument. It is well known that the general government, under the old confederacy, had no power over commerce, but each state acted in relation to it in a way most satisfactory to itself; and the consequences of

such action became so alarming to the country, that they became one of the most leading motives for the assembling of a convention to frame a new constitution. The new constitution, it was supposed, remedied the evils in the old articles of confederation. Such has been the view which the Supreme Court of the United States has constantly taken of the subject; and it has so repeatedly, as I understand it, decided the point under consideration, in the varied forms in which it has been there presented, that if I doubted the correctness of their decisions, I should still feel myself bound by them.

There are a number of decisions in the state courts, in which those tribunals have held differently from the Supreme Court of the United States, but I do not stop to cite them here; not because they are not entitled to great respect in themselves, but because I do not consider them as authority in such cases. In point of fact, all the cases that have ever reached the Supreme Court, on appeal from the state tribunals, have been cases where those courts have sustained the state laws; but the higher court reversed or affirmed them as in its judgment it thought right. It has the power to reverse them. It is the court of last resort in all such cases, and to its decisions we are bound to conform and submit, as much so as our local courts are bound to conform to the decisions of our own supreme tribunal.

The Supreme Court of the United States, having frequently had this question in some form before it, has uniformly, as I understand it, decided it in the same way. In 1819, or thereabouts, the state of Maryland passed an act to tax the branch of the United States Bank located in that state. The bank was chartered by an act of congress, in carrying out one of its constitutional functions. The court held that the act of congress, under the provision of the constitution on the subject, was supreme; and that where that power was supreme, any act of a state legislature that attempted to interfere with that power, or to burthen or restrain or impede it, was contrary to the constitution, and

therefore void. The decision of the state court sustaining that act was reversed. *McCulloch* v. *The State of Maryland,* 4 *Wheat.* 316.

A case, which attracted much more public attention, and was most elaborately argued and carefully considered, was the case of *Gibbons* v. *Ogden,* decided in 1819. The legislature of the state of New York had granted to certain persons the exclusive right, for a period of years, to navigate vessels propelled by fire, or steam, within or upon all the waters of that state, including its rivers, lakes, and bays. A portion of these exclusive rights and privileges had been transferred to Ogden, and were owned by him. Gibbons was the owner of two vessels, propelled by fire and steam, which were duly licensed, enrolled, &c., for the coasting trade. With these vessels he attempted to navigate the waters of New York, and to carry in them passengers, &c., from Elizabethtown, in this state, to places in the state of New York, and also from places in that state to Elizabethtown, in this state. From doing this he was restrained by an injunction from the Court of Chancery of the state of New York, pursuant to the provisions of the statute of that state. This proceeding was sustained by its highest legal tribunal, from which an appeal was taken to the Supreme Court of the United States. That court held the act of New York to be one which attempted to regulate commerce, which included navigation among the several states, and was therefore void. The court held that the right to regulate commerce among the states, extends to every species of commerce and intercourse between the states, to men as well as to things; that it does not stop at the boundaries of states, but penetrates their interiors; that the powers vested in congress are complete in themselves, limited only by the constitution itself, and is not a concurrent power which a state may exercise. 9 *Wheat.* 1.

In 1827, the case of *Brown* v. *The State of Maryland* came before the court. The legislature of that state had enacted, " that all importers of foreign articles or commodities, of dry goods, wares, or merchandise, by bale or pack-

age, or of wine, rum, brandy, whiskey, and other distilled spirituous liquors, &c., and all persons selling the same by wholesale, bale, or package, hogshead, barrel, or tierce, shall, before they are authorized to sell, take out a license from the state authorities, for which they should pay $50, subject to a penalty, &c. The defendant below was charged with having imported and sold one package of foreign dry goods, without having a license so to do. Judgment was given against the defendant in the state tribunals, and the case was removed into the Supreme Court. That court held this act of the legislature of Maryland to be void, not only because it was contrary to the provision of the constitution of the United States which prohibits the states from laying imposts or duties on imports or exports, but also because it was contrary and repugnant to the provision, which gives to the congress the power to regulate commerce with foreign nations and among the several states. The court strongly asserting, that the congressional privilege of importing foreign goods, &c., into a state, upon the payment of duties, or free from the payment of such duties, carried with it the right to sell such imports within a state, so long as they retained their character of imports, and remained in their original packages unbroken, and prior to their becoming mingled with the other private property of the citizens of the state, free from any impediments, in the shape of tax, license, or otherwise, imposed by state authority; reaffirming the doctrines announced in the case of *Gibbons* v. *Ogden*, and assuming that the same principles which applied to foreign importations applied equally to importations from sister states. 12 *Wheat.* 419.

In 1847, came up what were termed the license cases. The states of New Hampshire, Massachusetts, and Rhode Island had each passed a law prohibiting the sale of spirituous liquors within their respective limits, without a license for that purpose first obtained from the state authorities. The violators of these acts, being prosecuted, set up, as a defence, in two of the cases, that the liquors in question had

been imported from abroad, and in the other case, that a barrel of American gin, the one in question, had been purchased in Boston, and carried coastwise thence to New Hampshire, and there sold in the same barrel. The cases were all argued and decided together. The court reaffirmed the doctrine announced in the case of *Brown* v. *The State of Maryland;* but the court held, several of the judges delivering separate opinions, that in all the cases the point of importation into the states had been passed without obstruction or impediment. No question was made by the state laws about bringing the liquors into the states: they were then there, and had become the property of the citizens of the states the same as their other property, and as such, the traffic in them was subject to the control of the state authorities, and might be taxed or restrained by them, the same as any other business or traffic.

The court also held, that these acts were clearly matters of internal police regulation; that the right of the state to guard and protect themselves against internal violence, disease, and demoralization was one which they had never surrendered, which were in their natures paramount to the right of congress to regulate commerce; and that such laws did not necessarily come in conflict with the exclusive power of congress to do so. These propositions are unquestionably correct, and if they were not so, they need not be controverted here. They do not reach the case before us. The act of our legislature is not one for the protection of our health, or peace, or morals, nor has it any of the features of a police regulation, but is purely one for the raising of revenue; nor is it one which relates to the persons and property in the state, after all questions as to the mode, and manner, and terms, in and upon which they came into the state, has been lawfully settled and disposed of; but it is confined exclusively to those transactions which relate to the terms and conditions on which persons and property are brought into the state, or are carried out of it. The railway company, call it what we may, are prohibited from either bringing them in or

carrying them out of the state, except on the condition of paying this tax for the privilege of doing so. If in these license cases the states had prohibited the *introduction* of these liquors into the states, or the carrying them out, except upon a purchased license so to do, they would have been analogous to the one under consideration. Judge McLean, in his opinion on this distinction, remarks, that "if this tax had been laid on the property as an import into the state, the law would have been repugnant to the constitution. It would have been a regulation of commerce among the states, which has been given exclusively to congress." 5 *How.* 504, *License Cases.*

In 1849, the passenger cases came before the Supreme Court. The state of New York had passed an act imposing a certain tax on every passenger that should arrive in the port of New York, either from foreign ports or in coasting vessels, which tax was to be collected from the masters of the vessels, who were in turn authorized to collect it from the passengers, and the moneys thus collected were to be termed "hospital moneys;" and after the requisite sums had been expended for that purpose, the surplus, if any, was to be paid to the treasurer of the Society for the Reformation of Juvenile Delinquents in the city of New York. In 1841, the ship Henry Bliss arrived in the port of New York, and landed two hundred and ninety steerage passengers. The master was sued for the tax imposed on these passengers by this act of New York, and the claim was resisted on the ground, that the act under which the effort to collect the tax was made was contrary to the constitution of the United States. The case was elaborately discussed, and although the court was not unanimous, it adhered to its former decisions, and held that the act of New York was one regulating, or attempting to regulate commerce, and was therefore void, although it was earnestly insisted that it was but a police regulation. 7 *How.* 283, *Passenger Cases.*

In 1851, the Wheeling bridge case came before the Supreme Court. This bridge was erected wholly within the limits of the state of Virginia, and specifically authorized by an act

of the legislature of that state ; but in its construction, it was made so low that steamboats, with the tall chimneys commonly used on the western waters, could not pass under it. The state of Pennsylvania, finding her commerce with the west and southwest greatly obstructed and hindered thereby, applied to the equity side of the Supreme Court of the United States to compel its removal or modification, so that commerce would not be obstructed or impeded thereby; taking the ground, that the Ohio river, though belonging to Virginia, was a highway of commerce, and that no act of the legislature of Virginia could authorize or justify the erection of a bridge over such a river that would interfere with the commerce of the river. The court entertained the application, declared the bridge to be an obstruction and a nuisance, and ordered it to be removed, or so elevated that it should cease to be an obstruction to commerce. The latter of which alternatives has been adopted. 13 *How.* 518.

In 1859, the legislature of the state of Alabama passed an act requiring the owners of steamboats navigating the waters of that state, before such boats should leave the port of Mobile, to file a statement in writing, in the office of the probate judge of Mobile county, setting forth—first, the name of the vessel; second, the name of the owner or owners thereof; third, his or their place or places of residence; and fourth, the interest each has in the vessel; and on omitting to do so, they should be subject to a fine, &c. This act was resisted, as being contrary to the power conferred on congress to regulate commerce among the several states and the act of congress regulating the coasting trade. The Supreme Court of the United States held this act of the legislature of Alabama to be unconstitutional and void for these reasons. *Sinnot and others* v. *Davenport and others*, 22 *How.* 227.

The cases that are supposed to take a different view of the subject are—first, that of *Wilson and others* v. *The Blackbird Creek Marsh Company*, which was decided as early as 1829. The legislature of Delaware, by an act which it passed, authorized this creek company to build a dam across

one of the small creeks of that state, into which the tide flowed for some distance from the Delaware river through the marsh, and also to raise embankments on the shores. The defendants below were the owners of a sloop of less than one hundred tons burthen, regularly licensed and enrolled, claiming the right to navigate the creek as a highway of commerce, broke and injured the dam, for which injury the suit was brought; and the question was, whether this act of the legislature of Delaware, authorizing the dam, was repugnant to the constitution of the United States, on the ground of its interfering with commerce among the states. The defendants below were citizens of the state of Delaware. The court said the value of property on the banks of the creek, must be reclaimed by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce these objects, provided they do not come in collision with the powers of the general government, are undoubtedly within those that are reserved to the states. But the measure authorized by this act stops a navigable creek, and must be supposed to abridge the rights of those who have been accustomed to use it. But this abridgment, unless it comes in conflict with the constitution of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. The court adds, if congress had passed any act which bore upon the case, any act in execution of the power to regulate commerce, which was to control state legislation over those small navigable creeks, we should feel not much difficulty in saying, that a state law coming in conflict with such act would be void. But congress has passed no such act. We do not think that the act empowering the Blackbird Creek Marsh Company to place a dam across the creek can, *under all the circumstances of the case,* be considered as repugnant to the power to regulate commerce in its dormant state, or as being in conflict with any law passed on the subject.

It must be conceded, I think, that the language of the

court in this case, which is quite brief, is not very clear as to what general propositions it intended to annunciate, except to sustain the act of Delaware in that particular case; but it seems to assume that the state authorities in that section have a kind of concurrent jurisdiction with the general government, and that until congress sees fit to act in the matter, the states may do so, even to the damming up of a navigable river. If this be the idea, then it is certainly in conflict with all the cases decided on that subject, either before that time or since. 2 *Peters* 245.

The only other case, which it is supposed sustains the act of our legislature, is that of *The City of New York* v. *Milne*, 11 *Peters* 102, decided in 1837. An act of the legislature of the state of New York provided, that the master of every ship or vessel, arriving in the port of New York from any country out of the United States, or from any other state of the United States, shall, within twenty-four hours after his arrival, make a report in writing, to the mayor of the city, of the name, place of birth, and last legal settlement, age, and occupation of every person brought as a passenger in the ship or vessel, or on board of her on her last voyage, &c., under a penalty of $75 on each passenger. The city of New York sued the master of a vessel, who had landed such passengers, for not making the report required. The Supreme Court held that this act of the legislature of New York did not attempt in any way to regulate commerce, but was one which acted on the master and passengers after they were landed and had become inhabitants of that state; and was therefore a police regulation, which the state had a right to adopt, and was not in conflict with the constitution or laws of the United States. This decision is, I think, in perfect harmony with all that have been cited, or that have been rendered by that supreme tribunal, unless it may be, perhaps, the case of *Wilson and others* v. *The Blackbird Creek Company;* and that case, so far as it seems to hold that a state may go so far as to dam up a navigable river, and abolish thereby all navigation thereon and all commerce

thereon, provided congress has not legislated on the subject to the contrary, would not, I apprehend, at this day be sustained by any one.

The case of *Almy* v. *The State of California* came before the court as late as 1860. The legislature of that state passed an act to raise revenue for the support of the government thereof, and among other things, they enacted that all *bills of lading* for the transportation of gold or silver, in coin, bars, or dust, from any point or place in that state to any other point or place without the state, should have upon it a certain stamp, known there as a tax stamp, expressing in value the amount of such tax or duty.

To use such bill of lading without such stamp was, by the act, made a misdemeanor, and punished by fine. Almy, the defendant below, being the master of the ship Rattler, then lying at San Francisco, and bound for New York, received a quantity of gold dust, for which he gave a bill of lading without having any stamp attached to it. For this disobedience to the law of California, he was indicted, convicted, and fined $100.

The application for the reversal of this decison was put upon the ground of the unconstitutionality of this law of California, both because it attempted to tax the commerce among the states, and also because it was a tax upon exports. The Chief Justice, in delivering the opinion of the court, put it on the latter ground only, not discussing the other one at all. He says: if this tax was laid on gold or silver exported, every one would see that it was repugnant to the constitution of the United States. But a tax or duty on a bill of lading, although differing in form from a duty on the article shipped, is in substance the same thing. He says the intention to tax the export of gold and silver in the form of a tax on the bill of lading is too plain to be mistaken. The act was pronounced unconstitutional of course.

In that case it will be seen that the Supreme Court brushed away, without ceremony, a most ingenious fiction, by which the constitutional prohibition was to be evaded by

the use of other terms and other means, and reached at once·
the real thing itself. If the court would do this when some
question was supposed to exist as to the legality of the act,
in consequence of this attempt at evasion, we may be assured
that it would have annulled without hesitation an act that
had taxed the export itself. The Chief Justice remarked,
that that case could not be distinguished from that of *Brown*
v. *The State of Maryland*, already referred to. That was
an indirect tax upon an import. The California case was an
indirect tax upon an export; both stand on the same footing,
and the acts sustaining both were alike condemned as being
unconstitutional. Now, in what do those cases differ from
the one before us? What does our act in this respect do·
but to impose a tax on imports and exports both? Commodi-
ties brought into the state are imports, those taken out are
exports. Is not this the very business in which the railway
company is engaged, bringing imports into, and carrying·
exports out of the state? and what can the imposition of a
tax or duties on both of these be but a tax upon imports and
exports? Not, it is true, by taxing the commodities them-
selves directly, but by levying the tax upon the persons who
carry them. This was the California case precisely. They
did not attempt to tax the commodities themselves, but they
attempted to tax, in an indirect form, the master of the ship
who carried them. I do not propose further to discuss this
feature of the case. It appears to me that no words that I
can use can make it plainer.

I will simply add here, that the California case is a very
conclusive one on the other point which I have considered.
If that act authorized a tax upon an export, it unquestionably
authorized an interference with commerce among the states;.
for a taxing of imports or exports is most certainly an attempt
to regulate commerce: and if our act is an attempt to tax im-
ports or exports, it is undoubtedly an act to regulate, to that
extent, commerce among the states.

Nor am I able to see anything in conflict·with the views
I have expressed, in the fact that certain of the states, our·

own among the number, have, in the granting of chartered rights to canal and railroads companies, imposed upon them, as a part of the terms of the grant, the payment to the state of certain transit duties on the passengers and merchandise which they transport over their works; for, in the first place, these things are all confined to the limits of the states themselves. It is not contrary to the constitution of the United States to tax either the property or business of persons or corporations carried on exclusively within the state. The transit duties paid by the Camden and Amboy Railroad Company are not paid on passengers or merchandise on the ground that they come from other states, but it is exclusively on those who are carried within the state. Neither the chartered companies nor their rights extend beyond the limits of the state, nor is any difference made, nor is any notice taken, so far as the duties are concerned, whether the passengers and freight belong in the state or not. The charge is made on the assumption that all belong to the state, and nothing in addition is added in consequence of their coming from a foreign state.

The Camden and Amboy railroad does not extend from Philadelphia to New York, but from Camden to Amboy, wholly within the state; and the legislature had the right to impose on them the terms which they did, and the company had the right to accept them, and pay the duties, if they thought proper to do so. This being a transaction entirely within the state, it is in no way an attempt to regulate or to interfere with commerce among the states. The state, then, has the right to tax the business of anybody, carried on exclusively within the state, unless it may be the business of corporations or others who may have some special exemption from such taxation.

I do not know that any state has proceeded further by its legislation in this respect than our own previous to the act complained of; but if any of them have proceeded so far as to tax foreign persons or foreign merchandise for the privi-

lege of coming into the state, I do not hesitate to pronounce such taxation unlawful.

It is not unconstitutional for the owner of a ship, who carries the commodities of another across the Atlantic ocean, to charge him for the transportation of such commodities from New York to Europe. This is not a tax upon exports, nor is it a regulation of commerce, nor is it repugnant to the constitution, for this state, or any of its corporations, to charge persons, whether they be foreigners or not, for the privilege of being carried over their roads in an easy, convenient, and expeditious manner, which the state or company has been at great expense in providing. The traveller is not bound to adopt that mode of travel. He may go on foot, or he may go with his commodities in his own conveyance, but if he accept the terms of the company, and go with them, it becomes a matter of contract, and it is lawful for the company to accept the compensation. But does it follow that the state of Pennsylvania can prevent me from going into Philadelphia with my wagon load of commodities for sale, and then the state of New Jersey prevent me from returning into the state with my box of dry goods, or my barrel of sugar, or my load of guano, unless I pay a tax on myself and commodities, on each side, for the privilege of so doing? No one, I think, will contend for this. It is the very thing which the national constitution intended to prevent; and if the tax cannot be assessed directly on me and on my merchandise, what better pretence can there be for assessing the same thing against the person who owns the railroad, or the ferry boat, or the wagon and horses, which I employed to carry me and my goods the one way and the other.

Another answer to the idea, that precedent for imposing transit duties on corporations is to be found in different states is, that these things are all matters of contract, voluntarily entered into between the states on the one side, and the companies on the other. The companies offer to pay the state for the privileges granted, and this is done generally by the payment of a definite sum of money, or by contribu-

ting a specific portion of their earnings, or in some other way. Neither party is bound to accept the terms; but if they do so it is a voluntary matter, and the enforcement of it is not illegal, bearing in mind always that the contracts confine themselves to the state where the contract is made. If the attempt be made to go beyond the state, the transaction would probably be illegal, notwithstanding its voluntary character.

But in the case before us it is not confined to the state. It is not voluntary on the part of the company, nor is it a contract of any kind. On the contrary it is involuntary. It has no pretence of agreement about it, and it relates exclusively to transactions with persons and property of other states. There is no analogy, therefore, between the transactions referred to and the case before us.

It will be seen, I think, by a careful examination of all the cases, that the Supreme Court has been extremely cautious in attempting to interfere with the legislation of any of the states, and has only done so when compelled by the supreme law of the land. And while the state tribunals should not yield up to the general government any of the rights which belong to the states, it does not seem wise to attempt a useless conflict for the mere purpose of showing state independence, when it is morally certain that the Supreme Court, in accordance with its former decisions, will reverse the decisions of such state tribunals.

I think, therefore, that this claim on the part of the state against the railway company cannot be sustained, for the reason that our legislature had no power to pass the law under which the claim is made.

In the case of the Delaware, Lackawanna and Western Railroad Company, which was argued at the same time as the case with the Erie Railway Company, the same questions and principles precisely are involved, so far at least as the questions which I have endeavored to consider are concerned, and the conclusion in both cases should be the same.

State v. Delaware, Lackawanna, and Western R. R. Co.

A majority of the court being of opinion that the tax or duty imposed upon the said corporations was rightfully imposed, and that the law which authorized it was not an infringement of the constitution of the United States.

JUDGMENT for the State was ordered, in both cases, for the amounts severally agreed on.