[Civ. No. 817. Third Appellate District.—March 23, 1911.]

WESTERN UNION TELEGRAPH COMPANY, a Corporation, SOUTHERN PACIFIC COMPANY, a Corporation, and CENTRAL PACIFIC RAILWAY COMPANY, a Corporation, Petitioners, v. THE SUPERIOR COURT OF THE COUNTY OF SACRAMENTO, STATE OF CALIFORNIA, and Honorable C. N. POST, Judge Thereof, Respondents.

EMINENT DOMAIN—RIGHT OF FOREIGN TELEGRAPH COMPANY TO CONDEMN RIGHT OF WAY—DOING BUSINESS IN STATE—COLLATERAL CONSTITUTIONAL QUESTION.—Where a telegraph company organized under the laws of New York and protected by congressional legislation sought to condemn a right of way in this state, the question of its right to transact business in this state because not organized therein, as domestic corporations are, and whether it is prohibited from so doing by section 15 of article XII of the constitution, prohibiting such a corporation "to transact business in this state on more favorable conditions than are prescribed by law to similar corporations under the laws of this state," is in its nature collateral, and cannot be raised in the condemnation proceeding.

ID.—RIGHT TO TRANSACT BUSINESS INQUIRABLE ONLY AT SUIT OF STATE —QUO WARRANTO—DE JURE OR DE FACTO CORPORATION.—Where the existence of a corporation, whether *de jure* or *de facto*, appears, its right to transact business in this state may not be inquired into or questioned except in a direct proceeding in the nature of a *quo warranto* instituted and prosecuted by the state itself, in which such corporation so attempts to do business. It is held that the telegraph company, whose rights to condemn a right of way in this state are involved, is admitted by the pleading therein to be at least a *de facto* corporation.

ID.—CONGRESSIONAL GRANT OF RIGHT OF WAY—ACCEPTANCE—PARAMOUNT AUTHORITY OF CONGRESS OVER "POST ROADS."—The Congress

of the United States having expressly granted to any telegraph company organized under the laws of any state the rights to construct and maintain its lines of telegraph through and over any portion of the public domain of the United States, over and along any of the "post roads" of the United States, and having expressly declared all railroads to be "post roads," and having required acceptance of such rights to be filed with the postmaster-general, which acceptance was filed by such New York telegraph company, the rights thus conferred upon such accepting party give paramount authority to assert the same in any state or territory in the United States.

ID.—HOSTILE STATE LEGISLATION VOID.—The acts of Congress passed in the exercise of the authority conferred upon them by the constitution of the United States are the supreme law of the land, and any state legislation hostile to the right of foreign telegraph companies to construct their lines in this state over "post roads" so granted to and accepted thereby would be in direct conflict with the law of Congress and therefore void.

ID.—STATE CONSTITUTION INAPPLICABLE TO THE "ORGANIZATION" OF CORPORATIONS—"ORGANIZATION" NOT "TRANSACTING BUSINESS."—Section 15 of article XII of the state constitution has no application to the "organization" of domestic corporations, which is not the "transaction of business" by a corporation within the meaning of that section; and none of the sections of the Civil Code of this state relative to such organization can be considered in the construction of that section; nor can any foreign corporation be required to "organize" under the laws of this state, as a condition of "transacting business" therein. That section only refers to the "transaction of business" after the corporation is born or brought into being, as such.

ID.—COMPLIANCE OF FOREIGN CORPORATION WITH CIVIL CODE AS CONDITION OF "DOING BUSINESS."—Where it appears that the foreign telegraph company has fully complied with section 408 of the Civil Code, as a condition of its right to "do business" in this state, its authority to "do business" therein cannot be questioned. It has, therefore, authority to transact within the limits of this state the business for which it was incorporated under and by authority of the laws of the state of New York.

ID.—ENACTMENT OF SECTION OF CODE IN 1905—RAILROAD CORPORATIONS —PRIOR LAW NOT REPEALED—"PERSONS" AND CORPORATIONS.—The enactment of section 407 of the Civil Code in 1905, applicable solely to railroad corporations, cannot have the effect to repeal the provision of section 1001 of the Civil Code or section 1238 of the Code of Civil Procedure enacted in 1872, the first of which allows "any person" to acquire private property for a use specified in section 1238 of the Code of Civil Procedure, which expressly allows the right of eminent domain to be exercised for "telegraph and telephone lines." The word "person" in section 1001 "includes a

corporation" as well as a "natural person," and any "corporation" authorized to do business in this state may exercise the right of eminent domain for the uses authorized by law in this state by virtue of the code of 1872.

ID.—PROPERTY SOUGHT TO BE CONDEMNED—CONCESSION.—The property sought to be condemned by such New York telegraph company is conceded to be within a "post road" as defined by the laws of the United States. The legislation complained of, therefore, involves more than a mere regulation, but the substance of a right which cannot be interfered with.

ID.—REMEDY BY PROHIBITION NOT ALLOWABLE.—It is held that the alternative writ of prohibition at suit of a local telegraph company and of railroads doing business in this state, over whose "post road" the New York telegraph company has the legal right to construct its telegraph line in this state, must be discharged, as the writ of prohibition cannot be allowed in such a case.

ID.—ORDER DENYING REHEARING IN SUPREME COURT—DECISION OF DISTRICT COURT OF APPEAL LIMITED.—It is held by the supreme court in bank that a petition for a rehearing of the case in the supreme court after the decision in the district court of appeal is denied, without regard to the merits of the case, on the sole ground that the remedy by writ of prohibition is not available to the petitioners, and that the other questions discussed in the opinion pertain to the jurisdiction of the superior court, which is properly reviewable only upon appeal therefrom, and that the decision of the district court of appeal thereupon is not binding on this court, or on the trial court.    (By supreme court in bank.)

PETITION for writ of prohibition to the Superior Court of Sacramento County.    C. N. Post, Judge.

The facts are stated in the opinion of the court.

Beverly L. Hodghead, and Wm. H. Devlin, for Petitioners.

L. T. Hatfield, and O. W. Powers, for Respondents.

HART, J.—The Postal Telegraph-Cable Company, a corporation organized and existing under and by authority of the laws of the state of New York, commenced an action in the superior court in and for the county of Sacramento, on the twenty-sixth day of June, 1909, for the purpose of obtaining a judgment condemning a portion of the property of said petitioners, Southern Pacific Company and the Central Pacific Railway Company, situated in the county of Sacramento, "for the con-

struction, maintenance and operation of a telegraph line, by the erection of poles and the stringing of telegraph wires thereon.'' Said company claims, as is manifest from the fact of having instituted said proceeding, that, under the laws of California, it has the right to exercise the power of eminent domain in this state.

Contending, however, that foreign telegraph corporations are not authorized by the laws of California to exercise the right of eminent domain, the petitioners have applied to this court for a writ of prohibition to prevent the respondents from taking further proceedings in said action and to compel them to refrain and desist from further entertaining the same.

To the petition a demurrer and a return or answer have been interposed by the respondents, and in reviewing the questions presented we shall consider both said demurrer and return, if deemed necessary.

The specific contention of petitioners as to the alleged want of jurisdiction in respondents to hear and determine the issues raised by the complaint in said action is that if, as is the contention, there is no authority vested by the laws of California in foreign telegraph corporations to exercise the right of eminent domain, then a cause of action in behalf of said Postal Telegraph Company for the attainment of the object of said action could not, by any possibility, be stated, in which case the respondents could not, of course, acquire jurisdiction of an action instituted by said company for such purpose. Obviously, the proposition thus stated is true if the premise of which it is predicated be sound.

With respect to the question as to the right of the Postal Company to exercise the power of eminent domain in California, the contention is that the right in foreign corporations to exercise that power in this state is limited, by the terms of section 407 of the Civil Code, passed by the legislature of 1905 (Stats. 1905, p. 631), to ''railway or other corporations organized for the purpose of carrying freight or passengers.'' In other words, the position of petitioners is that, having by said section expressly granted the right to exercise the power of eminent domain to such foreign corporations only as are engaged in the business of carrying freight or passengers, the legislature intended to exclude all other foreign corporations not expressly named in said section from the right to exercise that power. This contention manifestly

follows from the application to section 407 of the Civil Code of the familiar canon of construction, *expressio unius est exclusio alterius.*

The further contention is made by the petitioners that, because said Postal Company has not complied with sections 291, 293, 294 and 295 of the Civil Code of California, said corporation is doing business in this state in violation of section 15 of article XII of the constitution. Said section reads: "No corporation organized outside the limits of this state shall be allowed to transact business within this state on more favorable conditions than are prescribed by law to similar corporations under the laws of this state."

The sections of the Civil Code referred to apply to "domestic corporations." The argument constructed around this proposition is that, if the statute of this state authorizing the condemnation of property for certain specified public uses is susceptible of being so construed as to permit foreign corporations to exercise the right of eminent domain, then said statute, in so far as it may apply to such corporations, is, in this case, violative of the constitution in that it would allow a foreign telegraph company "to transact business within the state of California on more favorable conditions" than is permitted to home or domestic corporations.

It may be well to here say, in connection with this constitutional question, which involves, as we have shown, the right of the Postal Telegraph Company to transact business in California, that the point made by counsel for respondents that said question cannot be raised in a proceeding instituted for the purpose of condemning property for a public use possesses much force. Such a proceeding is in its nature collateral, so far as said question is concerned, and the rule is that where the existence of a corporation, whether *de jure* or *de facto*, appears, its right to transact business may not be inquired into or questioned except in a direct proceeding, in the nature of *quo warranto,* instituted and prosecuted by the state itself in which such corporation so attempts to do business. The Postal Telegraph Company is shown by the undenied averments of its complaint in the condemnation proceedings complained of here (said complaint appearing here as a part of the petition) to be at least a *de facto* corporation, and, if we preferred to rest our decision of the constitutional question

raised here on that point, we should be inclined to hold that the position of respondents thereon is well taken. (See Cook on Corporations, 6th ed., sec. 637; *Postal Tel. etc. Co.* v. *Oregon etc. R. R. Co.,* 23 Utah, 474, [90 Am. St. Rep. 705, 65 Pac. 735].)

But the questions involving the merits of this controversy are of unusual importance, and, to some extent, novel, and we agree with counsel on both sides that a decision involving the merits of the questions submitted for determination is to be preferred to an adjudication which would still leave undecided points of the most vital importance to foreign telegraph companies and particularly at this time to the Postal Telegraph Company.

It will, perhaps, be the more orderly to first consider and dispose of the question whether the Postal Telegraph Company is, as alleged, doing business in California without authority for doing so. Manifestly, if this proposition were mantainable, said corporation would have no right to institute and prosecute proceedings in our local courts for the condemnation of property in this state for its uses as a *quasi* public corporation. If we find, as we think we can show, that this point is untenable, we shall then take up for consideration and decision the question whether section 407 of the Civil Code is capable of the construction to which counsel for petitioners would subject it.

As vitally bearing upon and, we think, largely determinative of all the questions which we are here called upon to consider, it may be well, first, to briefly inquire into and ascertain the status of telegraph companies with respect to their relation to the general government and, consequently, the attitude which the state governments must bear toward them. This will, of course, necessitate a brief review of some of the congressional legislation pertaining to such corporations.

Section 5263 of the Revised Statutes (U. S. Comp. Stats. 1901, p. 3579), provides: "Any telegraph company now organized or which may hereafter be organized, under the laws of any state, shall have the right to construct, maintain, and operate lines of telegraph through and over any portion of the public domain of the United States, over and along any of the military or post roads of the United States which may have been or may hereafter be declared such by law, and over,

under, or across the navigable streams or waters of the United States; but such lines of telegraph shall be so constructed and maintained as not to obstruct the navigation of such streams and waters, or interfere with the ordinary travel on such military or post roads.''

Section 3964 of said statutes (U. S. Comp. Stats. 1901, p. 2707) provides that ''all railroads or parts of railroads which are now or may hereafter be in operation'' are post roads.

Section 5266 (U. S. Comp. Stats. 1901, p. 3580) provides: ''Telegrams between the several departments of the government and their officers and agents, in their transmission over the lines of any telegraph company to which has been given the right of way, timber, or station demands from the public domain shall have priority over all other business, at such rates as the postmaster-general shall annually fix. . . . ''

Section 5268 (U. S. Comp. Stats. 1901, p. 3581) reads: ''Before any telegraph company shall exercise any of the powers or privileges conferred by law such company shall file their written acceptance with the postmaster-general of the restrictions and obligations required by law.''

It is asserted, and not denied here, that the Postal Telegraph Company has filed with the postmaster-general its written acceptance, etc., as required by the foregoing section.

The effect and scope of the congressional legislation with respect to telegraph companies which have complied with section 5268 of the United States Revised Statutes are clearly and fully explained and expounded in the case of *Pensacola Tel. Co.* v. *Western Union Tel. Co.,* 96 U. S. 1, [24 L. Ed. 708]. The principles enunciated in that case have never been, so far as has been disclosed by our examination of the federal cases on the subject, receded from or modified in the slightest particular in their application to the questions involved in said case and here. We, therefore, conceive that it will be sufficient to present here an excerpt from that case alone, without referring to or quoting from other cases, to illustrate the status of telegraph corporations to ʼthe federal government, where such corporations have accepted the restrictions and obligations imposed upon them by the laws of Congress.

In that case the Pensacola Telegraph Company was granted by the legislature of Florida ''the sole and exclusive privilege and right of establishing and maintaining lines of electric

telegraph in the counties of Escambia and Santa Rosa, either from different points within said counties, or connecting with lines coming into said counties, or either of them, from any point in this (Florida) or any other state." Said company was granted the further right to locate and erect its lines "along and upon any public road or highway, or across any water, or upon any railroad or private property for which permission shall first have been obtained from the proprietors thereof." In the year 1872, and after the granting of said rights and privileges, the Alabama and Florida Railroad Company, including its right of way and railroad, was transferred to the Pensacola and Louisville Railroad Company, and, by an act passed in 1873 and amended in 1874, the legislature authorized said telegraph company to construct, maintain and operate a telegraph line "from the Bay of Pensacola along the line of the said railroad as now located, or as it may hereafter be located, and along connecting roads in said county to the boundary lines of the state of Alabama," etc.

In June, 1874, said railroad company granted to the Western Union Telegraph Company "the right to erect a telegraph line upon its right of way, and also the rights and privileges conferred by the acts of February, 1873, and 1874." The Western Union Company thereupon commenced the erection of the line; but before its completion, the Pensacola company filed a bill in the United States circuit court for the purpose of enjoining said Western Union Company from continuing or completing the work or using said line, upon the ground of the alleged exclusive right of the Pensacola company to maintain and operate a telegraph line on and over the right of way of said railroad company and the charter granted to said Pensacola company by the Florida legislature.

Disavowing the power of a state to interfere with the right of a telegraph company that has accepted the restrictions and obligations imposed by the government on such corporations to do business within the borders of such state, in which there are military and post roads, the supreme court of the United States, speaking through Chief Justice Waite, says *inter alia:*

"Congress has power 'To regulate commerce with foreign nations and among the several states' (Const., art. I, sec. 8, par. 3), and 'to establish postoffices and post roads' (Const., art. I, sec. 8, par. 7). The constitution of the United States

and the laws made in pursuance thereof are the supreme law of the land. (Art. VI, par. 2.) A law of Congress made in pursuance of the constitution suspends or overrides all state statutes with which it is in conflict.

''Since the case of *Gibbons* v. *Ogden*, 9 Wheat. 1, [6 L. Ed. 23], it has never been doubted that commercial intercourse is an element of commerce which comes within the regulating power of Congress. Postoffices and post roads are established to facilitate the transmission of intelligence. Both commerce and the postal service are placed within the power of Congress, because, being national in their operation, they should be under the protecting care of the national government.

''The powers thus granted are not confined to the instrumentalities of commerce, or the postal service known or in use when the constitution was adopted, but they keep pace with the progress of the country, and adapt themselves to the new developments of time and circumstances. They extend from the horse with its rider to the stage-coach, from the sailing vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate, at all times and under all circumstances. As they were intrusted to the general government for the good of the nation, it is not only the right, but the duty, of Congress to see to it that intercourse among the states and the transmission of intelligence are not obstructed or unnecessarily encumbered by state legislation. . . .

''It is not only important to the people, but to the government. By means of it, the heads of the departments in Washington are kept in close communication with all their various agencies at home and abroad, and can know at almost any hour, by inquiry, what is transpiring anywhere that affects the interest they have in charge. Under such circumstances, it cannot for a moment be doubted that this powerful agency of commerce and intercommunication comes within the controlling power of Congress, certainly as against hostile state legislation. In fact, from the beginning, it seems to have been assumed that Congress might aid in developing the system; for the first telegraph line of any considerable extent ever erected

was built between Washington and Baltimore, only a little more than thirty years ago, with money appropriated by Congress for that purpose (5 Stats. at Large, 618), and large donations of land and money have since been made to aid in the construction of other lines.  (12 Stats. at Large, 489, 772; 13 Stats. at Large, 365; 14 Stats. at Large, 292.)  It is not necessary now to inquire whether Congress may assume the telegraph as part of the postal service, and exclude all others from its use.  The present case is satisfied if we find that Congress has power, by appropriate legislation, to prevent the states from placing obstructions in the way of its usefulness.

"The government of the United States, within the scope of its powers, operates upon every foot of territory under its jurisdiction.  It legislates for the whole nation, and is not embarrassed by state lines.  Its peculiar duty is to protect one part of the country from encroachments by another upon the national rights which belong to all."

From the principles as thus affirmed, these incontrovertible propositions flow: 1. That telegraph corporations that have accepted the restrictions and obligations prescribed as to such corporations by Congress are not, primarily, beholden to any state for their right to transact a telegraph business therein; that the sole source of their authority to enter any of the states or territories of the United States, where there are military and post roads and government waterways, for the purpose of doing business therein is in the acts of the federal Congress. 2. That no state has the power, under the indicated circumstances, to exclude such corporations from the right or privilege of carrying on the business for which they are formed within its borders; that, while the state may impose upon such corporations, as it may upon all corporations of whatever kind or nature, organized and existing under the laws of another state, reasonable regulations, and to that end prescribe and require certain reasonable prerequisites to the exercise of the authority conferred on them by Congress to do business in such state, yet no state will be permitted, whether under the guise of regulation or otherwise, to enact any legislation the effect of which would or might, practically, be to prevent them from doing business in such state, or in effect result in an attempt on the part of such state to regulate commercial intercourse between its citizens and those of other states, or to

control the transmission of all telegraphic correspondence within its own jurisdiction. In other words, any state legislation hostile to the right of such foreign telegraph corporations to do business in a state in which they are authorized to do business by Congress would be in direct conflict with the laws of Congress, and, therefore, void. By the light of these well-established propositions, we shall consider the questions submitted for determination by this proceeding.

1. As to the constitutional proposition urged upon us by the petitioners, we think that a brief examination here of the code sections themselves, even unaided by the very few decisions involving a construction of the effect and scope of section 15 of article XII of the constitution to be found in our own reports, will be all that will be required to show the utter untenableness of the contention of counsel for petitioners. It may be remarked that, while the constitutional provision in question has been considered by our supreme court in some of the cases, there has not been cited by counsel on either side any case which may be said with strictness to be directly in point here; yet there are expressions in some of the opinions which, if bearing upon the precise question here at all, sustain the contention of the respondents.

But, as stated, the code sections themselves are in language which, it seems to us, clearly discloses that by no possible construction can the things therein required to be done be counted as among the functions of the corporations to which they refer.

Section 290 points out in detail the matters which must be set forth in articles of incorporation.

Section 291 provides that the articles of incorporation of any railroad, wagon road or telegraph organization must state: 1. The kind of road or telegraph intended to be constructed; 2. The place from and to which it is intended to be run, and all the intermediate branches; 3. The estimated length of the road or telegraph line; 4. That at least ten per cent of the capital stock subscribed has been paid in to the treasurer of the intended corporation.

Section 293 reads: "Each intended corporation named in section two hundred and ninety-one, before filing articles of incorporation, must have actually subscribed to its capital stock, for each mile of the contemplated work, the following

15 Cal. App.—44

amounts, to wit: 1. One thousand dollars per mile of railroads; 2. One hundred dollars per mile of telegraph lines; 3. Three hundred dollars per mile of wagon roads.''

Section 294 provides: ''Before the articles of incorporation referred to in the preceding section are filed, there must be paid for the benefit of the corporation, to a treasurer elected by the subscribers, ten per cent of the amount subscribed.''

By section 295 it is provided that ''before the Secretary of State issues to any such corporation a certificate of the filing of articles of incorporation, there must be filed in his office an affidavit of the president, secretary, or treasurer named in the articles, that the required amount of the capital stock thereof has been actually subscribed, and ten per cent thereof actually paid to a treasurer for the benefit of the corporation.''

It is obvious that the foregoing sections are designed only to prescribe the requisites essential to the *formation* or *organization* of domestic corporations. In other words, it appears very plain that the sole purpose of said sections is to point out or prescribe the mode or manner of bringing into existence in this state, as creatures of our own laws, or as corporate entities, capable of performing corporate functions, the kinds of corporations to which said sections apply. Indeed, we do not understand counsel for petitioners to gainsay this proposition or to undertake to deny that the sole object of said sections is as we have declared it to be. This being true, it necessarily follows that, in order to justify us in sustaining the contention of the petitioners that said sections have the effect of imposing upon such corporations restrictions and obligations in the transaction of their business to which like foreign corporations doing business in this state are not subjected, or, in other words, that the effect of said sections is to permit certain foreign corporations to transact business in this state upon more favorable conditions than are thus accorded to similar domestic corporations, we are compelled to declare that the preliminary requisites which said sections prescribe shall be observed for the formation or organization of such domestic corporations constitute a part of the ''business'' of such corporations, within the meaning of that term as it is employed in section 15 of article XII of the constitution. It is very clear that we cannot so hold without doing violence to the plain, natural meaning of language.

To say, with counsel for petitioners, as we must say if we would accept their interpretation of section 15 of article XII of the constitution, that the things required by said sections of the Civil Code to be done in order to legally form or organize any of the several classes of corporations to which those sections apply are a necessary part of the "business" or functions for the specific carrying on or execution of which such corporations may, through said sections, be brought into existence, would, of course, be to hold that such corporations may perform a part of their corporate functions before they have acquired legal capacity to do business at all.

Counsel for petitioners refer to the case of *General Conf. of Free Baptists* v. *Berkey,* reported in the 36th Cal. Dec., page 330, wherein some expressions are used with regard to the scope of the section of the constitution in question. There is nothing in the opinion of Mr. Justice Shaw in that case which lends the slightest support to the position of petitioners here. On the contrary, there is language in said opinion which upholds the proposition, contended for by respondents here, that the constitutional provision has no reference or application to the prerequisites prescribed by said sections of the Civil Code to be observed in the formation of the classes of corporations to which those sections apply. It is therein said, among other things: "Alabama has a similar constitutional provision, and this case comes within the rule adopted in that state, where the court holds that, in order to constitute a violation thereof, *'there must be a doing of some of the work, or an exercise of some of the functions for which the corporation was created'* "; citing *Beard* v. *Union etc. Co.,* 71 Ala. 60, and *International etc. Co.* v. *Wheelock,* 124 Ala. 367, [27 South. 517].

The case of *General Conf. of Free Baptists* v. *Berkey, supra,* was subsequently reheard by the supreme court and the former judgment of that court was overruled; but in the later decision in that case by Mr. Justice Sloss (156 Cal. 466, [105 Pac. 411]), there is nothing said indicating any different view by the court upon the general object and scope of the constitutional provision from that expressed by Judge Shaw in the original opinion or at variance with the view expressed in the Alabama cases referred to therein and mentioned here. The difference between the first and later decisions in that case was in the respective constructions given in the opinions therein of the

effect of the holding by corporations organized for religious purposes of land on which to erect and maintain houses of worship and the selling of said land after there was no further use for it for such purpose by such corporations. By the first decision it was held that thus holding and selling land by such corporations was doing or transacting business within the purview of the constitutional provision under consideration. By the later decision, the conclusion was reached that the holding and selling of land, as stated, by a corporation organized for religious purposes constituted a mere incidental power of such corporation—i. e., that such holding and selling did not constitute "one of the ends for which it is organized, but merely a means to enable it to accomplish those ends." But, as before stated, by neither of those decisions is it intimated that the preliminary acts necessary to form or organize a corporation of any kind constitute any part of the business or functions for which such corporation may be organized. Indeed, it is very properly held in the later opinion that, even after corporations are formed for the purposes designated in their articles of incorporation, they may exercise a variety of powers in order to enable them to execute their main purpose. This is, of course, only a statement of the rule which necessarily applies in all cases of a grant of powers: that the body clothed with such powers may exercise, additionally, such implied or incidental powers as may be found necessary to enable it to execute its express powers, or, in other words, to properly and fully carry out its main purposes.

But the position of petitioners, if tenable, would in effect amount to a requirement that foreign telegraph companies reincorporate in California before they would be authorized to do business in this state. Clearly no such requirement or intention is contemplated by any provision of the law of California bearing upon the question of *quasi* public corporations of the class to which the Postal company belongs. The legislature could, of course, if it so elected, require corporations, organized under the laws of another state or country to reincorporate under the laws of this state as a condition precedent to their right to do business here. But it has not done so and, therefore, those cases cited by counsel for petitioners from other jurisdictions, where reincorporation by foreign corpora-

tions under the local laws is required before they can do business within such jurisdictions, are not in point.

We have perhaps given the point under present review more consideration than it really deserves, for it appears to us that no proposition could be clearer than that the sections of the Civil Code, to whose provisions it is contended obedience by foreign corporations of the classes therein named should be compelled in order that they may not be amenable to the charge that they are, where allowed to do so, doing business in California on more favorable conditions than are permitted to similar domestic corporations, cannot by any conceivably reasonable construction be held to treat or deal with any of the functions or the elements of business for which such corporations may be formed.   This we say deferentially to counsel for petitioners, to whom must be conceded the legal right to make and urge upon the courts any point which, in their judgment, may operate as a legal barrier or obstruction to the asserted right of the Postal Telegraph Company and other like foreign corporations to transact in California the business coming within the legitimate scope of the powers granted to them. But, the point having been made, it must, of course, be decided, and it seems to us (to briefly recapitulate and sum up the views heretofore expressed) that there is absolutely no escape from the conclusion that the section of the constitution referred to has no application to conditions with which compliance is made necessary by those sections in order that an aggregation or association of individuals may constitute themselves a corporation in California, but refers solely (to borrow the language of one of the briefs) "to the transaction of business after the corporation is born," or, in other words, after a corporation of any one of the classes referred to by said sections is established through the instrumentality thereof; that a foreign corporation, to legally do business or maintain an office in California, is authorized to do so after filing with our Secretary of State "a certified copy of its articles of incorporation, or of its charter, or of the statute or statutes, or legislative, or executive or governmental act or acts creating it, in cases where it had been created by charter, or statute, or legislative or executive, or governmental act, duly certified by the Secretary of State, or other officer authorized by the law of the jurisdiction under

which such corporation is formed to certify such copy," etc. (Civ. Code, sec. 408.)

It is admitted here that the Postal Telegraph-Cable Company has fully complied with said section of the Civil Code, and it, therefore, follows that it is authorized to transact within the limits of this state the business for which it was incorporated under and by the authority of the laws of the state of New York.

2. We are now brought to the consideration of the second question presented by this proceeding. This point, to restate it, involves the proposition whether, by the enactment of section 407 of the Civil Code, the legislature intended to limit the right to the exercise of the power of eminent domain in this state by foreign corporations to "railway or other corporations organized for the purpose of carrying freight or passengers."

As to this point, we may, without impropriety, in the outset of the consideration thereof, state that the conclusion at which we have arrived is: 1. That the legislature did not, by the enactment of section 407 of the Civil Code, design or intend to exclude from the right to exercise the power of eminent domain all foreign corporations other than those of the class mentioned in said section; 2. That, if such was the intention of the legislature or may be said would be the effect of the provision, if valid, said section, at least in so far as are concerned telegraph corporations, that have accepted the restrictions and obligations imposed by Congress upon such corporations, is void, as being directly antagonistic to rights granted and guaranteed by the "supreme law of the land"— i. e., by the acts of Congress from which, as we have seen, telegraph corporations which have duly accepted the restrictions and obligations prescribed as to them by the general government derive their right to transact business within any of the states and territories of the Union over, in or through which traverse "post or military roads," within the meaning of that phrase as used in the act of Congress.

Section 1001 of the Civil Code, enacted in the year 1872, reads: "Any person may, without further legislative action, acquire private property for any use specified in section twelve hundred and thirty-eight of the Code of Civil Procedure either by consent of the owner or by proceedings had under the provisions of title seven, part three, of the Code of Civil Pro-

cedure; and any person seeking to acquire property for any of the uses mentioned in such title is 'an agent of the state,' or a 'person in charge of such use,' within the meaning of those terms as used in such title.   This section shall be in force from and after the fourth day of April, eighteen hundred and seventy-two."

Section 1238 of the Code of Civil Procedure, among other provisions, contains the following: "Subject to the provisions of this title, the right of eminent domain may be exercised in behalf of the following uses: . . . Telegraph and telephone lines."   That section, in so far as it relates to telegraph lines, was, like section 1001 of the Civil Code, enacted in the year 1872 at the time of the adoption of all our laws in codified form.

It must be conceded that the word "person," as used in our state laws, "includes a corporation as well as a natural person."   (Civ. Code, sec. 14; *Lux* v. *Haggin,* 69 Cal. 255, [4 Pac. 919, 10 Pac. 674]; *Pasadena* v. *Stimson,* 91 Cal. 238, [27 Pac. 604]; *City of Los Angeles* v. *Leavis,* 119 Cal. 164, [51 Pac. 34]; *Robinson* v. *Southern Cal. Ry. Co.,* 129 Cal. 8, [61 Pac. 647].)

Speaking of section 1238 of the Code of Civil Procedure, *supra,* the supreme court says: "A corporation, whether private or public, is a person.   (Civ. Code, sec. 14.)   It follows, therefore, that under this general law—general in the widest and fullest sense of the term—any public or private corporation, or any natural person, may, for any of the uses defined in section 1238 of the Code of Civil Procedure, acquire private property without the consent of the owner, by means of the proceedings prescribed in part 3, title 7, of said code, sections 1237 to 1263."   (*Pasadena* v. *Stimson,* 91 Cal. 238, [27 Pac. 604].)

It will be noted that, for over thirty years before the enactment of section 407 of the Civil Code, section 1001 of said code existed, in its present form, as a part of our local system of jurisprudence; and we apprehend that, prior to the enactment of section 407 of the Civil Code by the legislature of 1905, no one could be found who, for a moment, would undertake to maintain that any corporation, whether private or public, could not, under the terms of section 1001 of the Civil Code and the provisions of the Code of Civil Procedure pre-

scribing the remedy therefor, exercise the power of eminent domain for the uses for which such power is authorized by law to be invoked in this state.

The important questions here, then, as stated, are: Was it the intention of the legislature that section 407 of the Civil Code should operate, except as to those corporations expressly named in said section, to abrogate the right of eminent domain with which all foreign corporations were undoubtedly invested by section 1001 of the Civil Code, and, if so, is not said section, to the extent that it was so designed to destroy that right, void?

An examination of the Statutes of 1905, page 631 et seq., will show that the legislature, at the time it passed section 407, and by the same act, enacted sections 405, 406, 408, 409 and 410 of said code. Each of these sections relates to corporations organized under the laws of other states, territories and countries, and, with the exception of section 407, all involve mere regulations to which such corporations are required to conform in order to authorize them to do business in this state or to maintain or defend actions or suits in the courts of this state. In other words, section 407 is the only one of the several sections embraced within that act of the legislature which purports to invest any particular class of foreign corporations with any substantive right.

Said section reads: "Every railway or other corporation organized for the purpose of carrying freight or passengers under or by virtue of the laws of the United States, or of any state or territory thereof, may build railroads, exercise the right of eminent domain, and transact any other business which it might do if it were created and organized under or by virtue of the laws of this state, and has the same rights, privileges, and immunities, and is subject to the same laws, penalties, obligations, and burdens as if created or organized under and by virtue of the laws of this state. Nothing contained in this section shall be construed to exempt any corporation from any duty or liability imposed upon it by any of the provisions of this chapter."

It may be remarked that, if the act of 1905, embracing among others, said section 407, constituted the pioneer in legislation upon the subject of foreign corporations, the courts would doubtless be compelled to hold, under the doctrine of construction, *expressio unius est exclusio alterius,* that, so far

as a state legislature would have the power to effect that result, the right to exercise the power of eminent domain was by said section 407 intended to be restricted to that class of foreign corporations expressly mentioned in said section. But, as we have shown, for a period of over thirty years antedating the enactment of said section 407, the established, accepted, unquestioned and unquestionable rule in this state was that, subject to any reasonable regulations which the state might deem proper to prescribe to such corporations, any foreign corporation authorized to do business in this state was clothed equally with like domestic corporations with the right to exercise, whenever necessary to do so for carrying on their legitimate business, the power of eminent domain. Now, it may be declared, as a matter of common knowledge, that the right in telegraph or other corporations organized for cognate purposes to exercise the power of eminent domain is absolutely, indeed, indispensably, essential to the carrying on of their business, for, obviously, without such right they could very easily be prevented from doing business at all. If, as may often happen and as perhaps has often happened, such corporations should be unable to secure, with the consent of the owner thereof, upon just compensation being offered therefor, rights of way over privately owned lands, it is very plain to be seen that, if petitioners' construction of section 407 be sound and the legislation therein, as so construed, the result only of a valid exercise of legislative power, they would thus be bereft of all power to extend their business as the exigencies thereof might require and thereby placed at the mercy of, if not in a position to be destroyed by, competing lines organized under the laws of our own state, and, besides, greatly impaired, if not destroyed, as governmental agencies.

In the ascertainment of the legislative intent at the base of a statute, the effect of which is, as would be the case here, if the theory of petitioners as to section 407 is supportable, to bring about a radical change in the matter of the enjoyment of substantive rights, we must search for and, if it can be discovered, look to the reason which appears to underlie or has inspired the amendment. We have in vain examined the provisions of section 407 to find some substantial reason why the legislature should have attempted and intended to deprive foreign telegraph companies, duly authorized to transact busi-

ness in California, of the exercise of a right without the enjoyment of which they might, practically, be prevented from doing business in the state at all. While the fact of the absence of any sound reason for the construction of the code section claimed for it by petitioners may itself be counted as a reason why the legislature did not intend by the enactment of said section to deny to foreign telegraph companies, lawfully prosecuting their business in this state, the right, on appropriate occasions, to condemn property for their necessary uses as such corporations, still there are other considerations, significant and potent, which support the position that such was not the intention of the law-making department in the enactment of said section. The trend of modern legislation, both national and state, has been and is to discourage, and, indeed, to destroy monopolies of every kind and description. The policy of our governments, if it has not always been, is certainly now to encourage and promote free and unhampered competition in all classes of business and in the sale of all sorts of commodities, particularly the necessaries of life. To this end, there has been added to our statutes, federal and state, a variety of wholesome laws whose aim is to prevent or destroy and punish penally what have been colloquially but in many instances justly characterized as *predatory* trusts and combinations—in other words, monopolies which could control the markets of the world in their lines of activity and thus impose upon the consumers the most outrageous and even unbearable burdens. At this deplorable condition, we say, modern legislation, sustained by a powerful and unmistakable common sentiment, has aimed its well-charged batteries. In view of these considerations, as well as others already and to be hereafter suggested, it is hardly conceivable that the legislature of California, so late as the year 1905, would ingraft upon the statute books a law intended to so cripple foreign telegraph corporations, authorized to do business in this state, and desiring manifestly to make transcontinental connections here, as to result in preventing them from carrying out, the most advantageously to the public and to our governments, the purposes for which they are formed. Again, it is highly probable that, the right in foreign telegraph corporations to condemn property under the power of eminent domain having existed for many years prior to the passage and approval of

section 407, the legislature, if it intended by said section to interdict that right, would therein have expressly so declared. Moreover, had it intended to take from such corporations the rights conferred upon them by section 1001 of the Civil Code, then it seems to us the act of 1905, within which section 407 is embraced, would have contained, as it does not contain, a clause repealing all laws then in existence in conflict with the terms of said section.

We do not know, nor have we, after viewing the statute from every conceivable angle, been able to discover what precise reason prompted its enactment, for, manifestly, it confers on foreign railroad corporations, authorized to do business in this state, no greater rights than they already had or could have exercised prior to the passage of said section. This fact, it may be conceded, might itself furnish the foundation for a persuasive, if not conclusive, argument in support of the construction given the section by counsel for petitioners if we were to overlook the other considerations, to which we have referred, conclusively proving, we think, that such construction cannot be maintained upon any reasonable theory.

But, as declared, if in fact it was the intention of the legislature, by the enactment of said section, to exclude from the right of condemning property under the power of eminent domain all other foreign corporations than those of the class mentioned therein, the section in effect contravenes the laws of Congress with respect to foreign telegraph corporations which have subscribed to the restrictions and obligations imposed upon such corporations by Congress, and, therefore, to the extent that it attempts to preclude such corporations authorized to carry on their business in California from the exercise of such right, is invalid.

It is conceded that the property sought to be condemned by the Postal Telegraph-Cable Company in the proceeding pending before respondents is embraced within a "post road" as established and defined by the act of Congress.

We have already seen that the right in telegraph corporations which have accepted the restrictions and obligations imposed upon them by the federal government to establish their lines within the limits of a state or territory where there exist "post roads" within the purview of the act of Congress establishing such "roads" comes, primarily, through the authority

of Congress; that such right cannot be divested, nor interfered with, by state legislation. Telegraph lines are now esteemed to be and are among the most potent agencies through which interstate communication and the highest welfare of our people and our governments, both federal and state, may be promoted and maintained. Indeed, they are, in our present civilization, absolutely essential to the full and proper transaction of the business of the general government. Such agencies, therefore, come within the proper, in truth, the *peculiar* province of the federal government to foster and protect, in order that they may subserve the ends of said government. The acts of Congress with respect to such agencies of government are, therefore, paramount to state laws. The principle announced by Mr. Justice Harlan, of the United States supreme court, in a very recent case (*Chicago etc. Ry. Co.* v. *United States,* 219 U. S. 486, [31 Sup. Ct. Rep. 272, 55 L. Ed.—]), is applicable here, that ''no state enactment can be of any avail when the subject of such transactions has been covered by an act of Congress, acting within the limits of its constitutional powers.'' In other words, it is thoroughly established that when ''an act of the legislature of a state prescribes a regulation of the subject repugnant to and inconsistent with the regulation of Congress, the state law must give way, and this without regard to the source of power whence the state legislature derived its enactment.'' (*Sinnot* v. *Davenport,* 22 How. 227, [16 L. Ed. 243]; *M., K. & T. R. Co.* v. *Haber,* 169 U. S. 613, 626, [18 Sup. Ct. Rep. 488, 42 L. Ed. 878]; *Reid* v. *Colorado,* 187 U. S. 137, [23 Sup. Ct. Rep. 92, 47 L. Ed. 108].)

The legislation complained of here involves more than a mere regulation—it involves the substance of right.

As before stated, the deprivation of the right in such corporations to condemn property for their uses, whenever necessary, might deprive them of the right to do business at all, as would, to a large extent, be the effect of a denial of that right in the present case. The legislation involved in said section is, therefore, hostile to the right guaranteed to such corporations by the federal government, and for this reason, if for no other, it cannot be sustained. The federal reports contain many cases sustaining this view. Counsel on both sides have, with commendable industry and ability, reviewed and analyzed those and many state cases in the elaborate briefs filed herein

for our enlightenment upon the important questions involved in this controversy. It would be inconvenient—indeed, impossible—to review here all the cases citied without almost interminably extending this opinion. But it will be sufficient to say that we have carefully read the voluminous and instructive briefs filed in this cause and the cases therein cited, and we feel persuaded that the final conclusion at which we have arrived fully harmonizes with both principle and precedent.

It follows, from the foregoing, that the order to show cause or the alternative writ of prohibition herein issued must be discharged, and such is the order.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 22, 1911, and the following opinion then rendered thereon:

THE COURT.—The petition for a transfer of this cause for rehearing in the supreme court after decision in the district court of appeal is denied without regard to the merits of the controversy between the real parties in interest, and upon the sole ground that in our opinion the remedy by prohibition is not available to the petitioners. It is sought by this proceeding to prohibit the superior court from hearing an application by a foreign corporation to condemn private property for a public use upon the ground that the superior court has no jurisdiction to listen to such an application by such a party.

It is true that the capacity of a foreign corporation to exercise the power of eminent domain in this state is purely a question of law, but it is a question as much within the jurisdiction of the superior court as other questions of law arising in similar cases which are held to be reviewable here only on appeal.

We have deemed it proper to make this explicit statement of our reasons for refusing to transfer the cause to this court for a further hearing, in order to guard against the assumption that the decision of the district court of appeal upon the questions therein so fully discussed is a precedent binding upon this court or the trial court—the question being one as to which we prefer to reserve our opinion until after more mature consideration than we have been able to give it.